**BALDWIN–LIMA–HAMILTON CORPORATION, a corporation of Delaware, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 17773.**

United States Court of Appeals, Seventh Circuit.

Dec. 3, 1970.

Johnnie M. Walters, Asst. Atty. Gen., John Brown, Atty., Tax Division, U. S. Department of Justice, Washington, D. C., William J. Bauer, U. S. Atty., Chicago, Ill., Lee A. Jackson, Harry Baum, Stuart A. Smith, Attys., Department of Justice, Washington, D. C., Thomas A. Foran, U. S. Atty., of counsel, for appellant.

Sheldon P. Migdal, Lorentz B. Knouff, Stephen N. Engberg, Chicago, Ill., Wildman, Harrold, Allen & Dixon, Knouff & Ley, Chicago, Ill., of counsel, for appellee.

Before DUFFY and KNOCH, Senior Circuit Judges, and KERNER, Circuit Judge.

KERNER, Circuit Judge.

Baldwin-Lima-Hamilton Corporation (Taxpayer), as transferee of the Austin-Western Company (AW), brought this refund suit in the district court to recover income taxes in the amount of $108,271.50 for 1953, 1954 and 1955. The Commissioner had determined under § 482 of the Internal Revenue Code, 26 U.S.C. § 482 (1954) (formerly § 45 of the 1939 Internal Revenue Code), that all of the income for those years of the Austin-Western Hemisphere Company (AWH) a subsidiary of AW, be reflected as the income of its parent, AW, for federal tax purposes. The district court found that the Commissioner's total re-allocation of income was unreasonable, arbitrary and erroneous, and held that no part of AWH's income be allocated to AW. While we agree with the district court that the Commissioner's total re-allocation of income was erroneous, we believe some re-allocation is necessary. We remand this case to the district court to determine what part of AWH's income should be allocated to AW.

From 1953 to 1955, AW manufactured heavy machinery and equipment (such as road graders, road rollers, hydraulic cranes and street sweepers), which it sold to distributors in the United States and foreign countries. The machines, valued from $16,000 to $20,000, were made to the specific order of the distributors, who in turn sold them to the ultimate users. The distributors developed the market and maintained contact with the customers by providing instructions, parts and service and demonstrating the machines.

In 1952, AWH was incorporated as a wholly owned subsidiary of AW. The initial capitalization was $5,000, and nothing more was invested in AWH. AWH was to act as a distributor of AW's products in the Western Hemisphere outside of the United States. The stated purpose of AWH's incorporation was to expand foreign trade for AW and to take advantage of tax benefits under § 921 and § 922 of the Internal Revenue Code, 26 U.S.C. §§ 921, 922 (1954) (formerly §§ 109 and 26(i) of the 1939 Internal Revenue Code), which imposes reduced tax rates on a corporation which qualifies as a Western Hemisphere Trade Corporation. In order to qualify as a Western Hemisphere Trade Corporation, a corporation must derive 95% of its gross income from sources outside of the United States and within the Western Hemisphere.

AWH sold AW's machinery to the same 25 to 30 foreign distributors who, prior to AWH's creation, had bought directly from AW. AWH became responsible for filling orders and shipping the goods to the distributors. At the time of AWH's incorporation, AW notified its distributors that they would be dealing with AWH in the future, but that there would be no other change in the

terms and conditions of their sales relationship. AWH made no effort to seek additional distributors in its designated market, although it employed a Spanish speaking salesman who kept in contact with the distributors. AWH also sent some printed catalogues, circulars and other advertising material written in the Spanish language to the distributors, but the distributors themselves were primarily responsible for the advertising to their customers.

AWH was officed in AW's building in Aurora, Illinois, and had no other office space or warehouse, and paid AW rent for the offices. AWH had no inventory of machines or parts other than those which were ordered by the distributors and in transit to them. Some AWH employees worked in its export department performing supervisory, clerical and sales duties, but this was the extent of AWH's separate work force. A number of employees worked jointly for AW and AWH in arranging for shipment and insurance, and in managing AWH's office in Aurora. AW paid the salaries of AWH's employees and did other administrative work for AWH.

On October 8, 1952, AWH's Board of Directors passed a resolution in which it agreed to pay AW for the cost of the machinery plus "an amount equal to fifteen per cent (15%) of the cost price of products purchased by this corporation from Austin-Western Company * * * in payment for the furnishing of general administrative services by officers and employees of Austin-Western Company to this corporation." The 15% cost figure, which sought to represent the services performed by AW, was justified at trial on the basis of the average of AW's cost from 1948 to 1952. A study introduced at trial indicated that this 15% figure, which was AW's sole remuneration from AWH other than for AW's bare manufacturing costs, included 10% for general administrative services and 5% for profit to AW. The cost figure, against which the 15% was applied, represented AW's manufacturing costs only, and did not include the additional costs of marketing which AW charged to its other distributors.

From 1953 to 1955, AWH's net profit percentage (to cost) exceeded AW's net profit percentage and the consolidated net profit percentage for both AW and AWH. In 1953, AWH's net profit percentage was 12.9%, AW's percentage was 11.9%, and the consolidated net profit percentage was 12.1%; for 1954 and 1955 respectively, 9.5% and 9.8% represented the net profit percentage for AWH, 8.5% and 2.5% for AW, and 8.-6% and 3.2% for both AW and AWH in the consolidated net figure.

The Commissioner, under § 482, ruled that all of AWH's net income should be allocated to AW. Section 482 provides:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The district court decided that the net income of AW on its sales to AWH, was clearly reflected on AW's returns and that the Commissioner had acted unreasonably and arbitrarily in allocating all of AWH's net income to AW. It also held that no apportionment between AW and AWH was necessary under § 482.

The practical advantage of inflating AWH's income is obvious. Since it was a Western Hemisphere Trade Corporation, its income was taxed at a rate substantially lower than that of AW. The corporations between them, would pay less taxes if more income were attributed to AWH.

■ Taxpayer argues that since AWH was a valid Western Hemisphere Trade Corporation and entitled to take advantage of the tax benefits under § 922, the Commissioner cannot use § 482 to strip it of its favored tax treatment. The creation of a corporation in order to obtain tax benefits is a valid business purpose and cannot constitute evasion of taxes. Nevertheless, Western Hemisphere Trade Corporations are not immune from § 482.

> If Congress had intended to make * * * [§ 482] * * * inapplicable to Western Hemisphere trade corporations, it would have been very simple to have said so at the time the original Western Hemisphere trade corporation provisions were enacted. Eli Lilly & Company v. United States, 372 F.2d 990, 1001, 178 Ct.Cl. 666, (1967).

Even if the creation of a Western Hemisphere Trade Corporation, such as AWH, was not for the purpose of tax avoidance, the sales transactions and pricing policies between it and AW are subject to § 482 inquiry. The income of each company must be "clearly reflected" for tax purposes.

Taxpayer's reliance on W. Braun Co. v. C.I.R., 396 F.2d 264 (2d Cir. 1968), is misplaced. *Braun* merely holds that the creation of a corporation to take advantage of the tax laws does not constitute evasion of taxes under § 482. It does not decide that § 482 is inapplicable if the income of a validly created corporation, such as AWH, is not clearly reflected *vis-à-vis* its parent.

The evil to which § 482 addresses itself is the "* * * improper 'milking' of one business for the benefit of the other, * * *." Simon J. Murphy Co. v. Commissioner of Internal Rev., 231 F.2d 639, 644 (6th Cir. 1956). See Mertens, Law of Federal Income Taxation, vol. 7, § 38.61 *et seq*. As the Third Circuit stated:

> Whenever the lack of an arm's length relationship produces a different economic result from that which would ensue in the case of two uncontrolled taxpayers dealing at arm's length, the Commissioner is authorized to allocate gross income and deductions. Commissioner of Internal Revenue v. Chelsea Products, Inc., 197 F.2d 620, 623 (3d Cir. 1952).

The test which the Commissioner followed is whether the controlled taxpayers would have realized the same income from their sales transactions if they had conducted them at arm's length. Local Finance Corp. v. C.I.R., 407 F.2d 629 (7th Cir. 1969); W. Braun Co. v. C.I.R., *supra*; Eli Lilly & Co. v. United States, *supra*; Ach v. C.I.R., 358 F.2d 342 (6th Cir. 1966); Cohen v. C.I.R., 266 F.2d 5 (9th Cir. 1959).

The Commissioner decided that the inter-organizational sales between AW and AWH reflected on their tax returns presented an inaccurate portrait of their respective income. For this reason, he re-allocated the income between the companies under § 482 in order to place AWH on a parity with the other distributors of AW's products.

■ Taxpayer bears the burden in this refund suit to show that the Commissioner's re-allocation was arbitrary, and that the amounts shown on the tax returns were correct. Local Finance Corp. v. C.I.R., *supra*; Eli Lilly & Co. v. United States, *supra*; Grenada Industries, Inc. v. Commissioner of Internal Rev., 17 T.C. 231, 259 (1951), aff'd 202 F.2d 873 (5th Cir. 1953), cert. denied 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345 (1953). It advanced two theories in the district court to show that the AW–AWH sales transactions constituted an arm's length relationship, and that the Commissioner's total re-allocation was thus erroneous. First, it alleged that the 5% profit margin realized in the AWH resolution by AW represented the profit AW would have made in an arm's length sale to other distributors. Second, the actual profits AWH realized would have been the same if it were an uncontrolled domestic distributor of AW. While both theories indicate that a total

re-allocation of income from AWH to AW by the Commissioner was erroneous, they also show that some re-allocation was necessary. The district court did not critically examine these theories and make a finding that partial re-allocation was necessary.

The 115% cost theory fails to demonstrate that the income of AW and AWH was clearly reflected by AW. The 115% figure was based on AW's costs of production to independent distributors from 1948 to 1952. Using this cost figure, a 5% profit margin to AW was reached. Yet, AW's actual profit margin for those same years, 1948 to 1952, exceeded 5% and were respectively 7.-05%, 9.38%, 10.2% and 10.51%. Thus, this study cannot be used to justify the arm's length test; according to its own terms, the study shows a discrepancy between the profit realized by AW from its independent distributors between 1948 and 1952, and from AWH, hypothesized as a 1948 to 1952 independent distributor for profit purposes. The deviations in the respective profit margins justify some re-allocation of income from AW to AWH.

Besides this, the cost against which the 115% is applied and the 5% profit margin derived is based on the costs of manufacturing only. The study of the cost from 1948 to 1952 used total cost of production, which is higher than manufacturing cost. If the total cost of production from 1952 to 1955 to AWH were used, the actual amount realized by AW from its sales to AWH would amount to a profit margin of less than 5%.

The second theory—treating AWH as an independent domestic distributor—rests on the assumption that the prices AWH paid would have been the same if it were an independent distributor. The fallacy of this theory is that AWH would not have been entitled to the discounts which the study gave it. Without the discounts, AWH's costs would be higher and its profit lower. To give to AWH certain discounts which it would not have received as an independent and uncontrolled distributor is not a proper application of the arm's length standard here.

The Regular Distributor Discount of 22.5% was given to AWH when it was entitled only to a 17.5% discount. The 22.5% discount is given only to Class A distributors, which are classified as possessing financial strength and stocking a considerable amount of repair parts. AWH fails to meet these standards; its initial and only capitalization was a bare $5,000, and it did not stock parts. Since AWH could not claim the full 22.5% discount here, its costs would be higher, and its profits lower.

AWH was also given the Prompt Payment Discount in this hypothetical pricing study used to justify the prices charged by AW. Independent distributors were given this discount if they paid cash by the tenth day of the month following the date of invoice. Yet, AWH paid its bills by this day of the month on only 20 of the 36 occasions. This fact was not reflected in the hypothetical study.

Further, the Selling and Advertising Expenses Discount given to AWH did not take into account the fact that AW participated to some extent in the advertising for which AWH would have been responsible as an independent distributor. With respect to the Quantity and Middleman Discount given to AWH, there is evidence that AW did not actually give this discount to its other distributors.

Taxpayer argues that if AWH were not given the discounts, it could make no profit in its sales to its customer-distributors. In a case where AWH's distributors would be entitled to the discounts but AWH would not, AWH could make no profit since AWH would have to buy from AW at a price higher than that at which it would sell to its distributors. Yet, the fact that AWH would make no profit should not be a consideration in applying the arm's length test.

In both studies, the scales were tipped in the taxpayer's favor.

The analogy between AWH and the independent distributor, which must form the basis for application of the arm's length standard to this case, contained misleading assumptions and was highly biased in favor of the taxpayer. These studies likewise indicate, however, that AWH did realize some income in its sales from AW. Thus, the Commissioner's total re-allocation under both theories advanced by the taxpayer was erroneous. Accordingly, we affirm that part of the district court's opinion.

Yet, when AWH is placed on a parity with AW's other distributors, it is clear that its income would be reduced and AW's increased. We thus remand this portion of the case to the district court for a determination of partial re-allocation. The district court has the power to decide what portion of AWH's income should be re-allocated to AW. W. Braun Co. v. C.I.R., *supra*; Ach v. C.I.R., *supra*. The court may base its decision on either of the two theories advanced by the taxpayer, but should reject those aspects of the theories which do not meet the arm's length standard.

Affirmed in part, reversed and remanded in part, with instructions.