*Decision will be entered for the petitioner.*

KERRY INVESTMENT COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2568–70. Filed June 20, 1972.

*James Wm. Johnston* and *William R. Smith*, for the petitioner.
*Eugene H. Flood*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $10,058.38 in the petitioner's Federal income tax for 1966 and a deficiency of $11,826.61 in the petitioner's Federal income tax for 1967. The only issue for decision is whether, in the circumstances of this case, the respondent was authorized under section 482 of the Internal Revenue Code of 1954 [1] to increase the petitioner's income inasmuch as it made interest-free loans to its subsidiary.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Kerry Investment Co., is a Washington corporation having its office in Seattle, Wash., at the time of the filing of its petition in this case. For the calendar years 1966 and 1967, it timely filed its Federal income tax returns, using the accrual method of accounting, with the Internal Revenue Service office at Ogden, Utah.

Since its organization in 1929, the petitioner has been owned and controlled by Albert S. Kerry, Sr., his wife, his children, and their families. At all times material to this case, the petitioner has been a personal holding company with its assets consisting primarily of stocks, bonds, debentures, and notes and contracts receivable. At least since April 30, 1942, the Kerry family has also, directly or indirectly, controlled Kerry Timber Co. (Timber), and until its liquidation in 1948 the Seattle Medical Arts Building Co. (Medical Arts). From October 28, 1943, to December 29, 1948, the petitioner owned all the outstanding capital stock of Medical Arts, and since December 29, 1950, it has owned all the outstanding capital stock of Timber.

Timber is a Washington corporation which is engaged in the business of owning, leasing, and operating various commercial office buildings, apartment houses, and other real estate. Prior to its liquidation, Medical Arts operated the Medical Arts Building in downtown Seattle as lessee and owned and leased the Southcourt Apartments in Bremerton, Wash.

On December 23, 1948, Medical Arts sold the Southcourt Apartments and the Medical Arts Building leasehold and equipment to Timber for $127,609.54. The contract of sale provided for a downpayment of $7,609.54 and for the balance to be paid in 12 equal annual installments. It also provided that the balance was not to bear interest. The downpayment was made on December 24, 1948, and on December 29, 1948, when Medical Arts was liquidated, the contract of sale was transferred to the petitioner. The petitioner has held the contract since that time and has received no payments upon the deferred balance of the purchase price. Similarly, no interest has ever been paid on this indebtedness.

---

[1] All statutory references are to the Internal Revenue Code of 1954.

On July 15, 1956, Timber purchased the First and Seneca Building for a purchase price of $169,000. In order to finance this purchase, Timber borrowed $18,000 from the petitioner and $150,000 from the Washington Mutual Savings Bank. The loan from the petitioner was evidenced by a non-interest-bearing demand note and the bank loan was evidenced by a 5-percent note which was payable in quarterly installments of $7,500 and secured by a real and chattel mortgage covering the Medical Arts Building, the Southcourt Apartments, and the First and Seneca Building. The loan by the bank has been repaid in full, but no payment of interest or principal has been made on the note payable to the petitioner.

On May 22, 1957, the petitioner sold to Timber certain common stock, preferred stock, and promissory notes of the Wilkeson Cut Stone Co. (Wilkeson). The total purchase price of $24,500 was allocated as follows: $8,250 for the common stock, $3,750 for the preferred stock, and $12,500 for the promissory notes. The purchase price was evidenced by a non-interest-bearing demand note payable to the petitioner. In 1958, Wilkeson paid in full the promissory notes and redeemed the preferred stock. No payments of interest or principal have ever been made on the demand note payable to the petitioner.

On September 18, 1957, the petitioner sold debentures of General American Industries (General debentures), which had a face value of $45,000, to Timber for $24,617.50. The purchase price was evidenced by a non-interest-bearing promissory note payable to the petitioner on demand. Prior to June 30, 1966, Timber sold or disposed of the debentures. No payments of interest or principal have been made on the note payable to the petitioner.

On October 13, 1959, Timber borrowed $20,000 from the petitioner for the purpose of making a loan to Wilkeson. The loan from the petitioner to Timber bore no interest, and the loan from Timber to Wilkeson bore 6-percent interest. Sometime before June 30, 1968, Wilkeson repaid the loan from Timber. No payments of interest or principal have been made on the loan from the petitioner.

On or about January 24, 1961, Timber purchased a parking lot situated adjacent to the Southcourt Apartments for a cash purchase price of $38,887.60. In order to finance the purchase, Timber borrowed $30,000 from the petitioner. The loan was evidenced by a non-interest-bearing demand note payable to the petitioner. No payments of principal or interest have been made on the note.

In 1966, Timber purchased the Colonial Building and the Grand Pacific Building for a total purchase price of $208,901 payable in cash. To finance this purchase, Timber borrowed $100,000 from the petitioner on June 7, 1966, and $110,000 from the Washington Mutual Savings Bank on August 29, 1966. The loan from the bank was at 6½-percent interest and was secured by a real and chattel mortgage

covering the Medical Arts Building and the First and Seneca Building. The loan from the petitioner was evidenced by a non-interest-bearing demand note. Timber has made regular payments of principal and interest to the bank, but has not made any payments of interest or principal to the petitioner.

During the period from February 13, 1951, to April 3, 1958, Timber borrowed $57,500 from the petitioner for the purpose of making improvements to the Medical Arts Building and $36,000 for the purpose of making improvements to the First and Seneca Building. An additional $16,000 was borrowed from the petitioner for the purpose of making improvements to both buildings. Each such loan was evidenced by a non-interest-bearing demand note payable to the petitioner, and the proceeds of each loan were used by Timber for the intended purposes. No interest or principal payments have been made on any of the notes.

From September 23, 1948, to July 31, 1966, the petitioner made open account advances of $255,888.32 to Timber for the purposes of providing Timber with funds for current operations, advances to tenants, and investments. Timber has repaid all but $59,000 of these advances. None of the open account advances bore interest.

During the period from December 23, 1948, to December 10, 1957, the petitioner also made interest-free loans of $88,021.98 to Timber for current operations, for improvements to real estate, and for other purposes. These loans had been repaid in full prior to January 1, 1966.

During 1966 and 1967, the following non-interest-bearing debts were owed by Timber to the petitioner:

| Transaction | Amount of indebtedness |
| --- | --- |
| Medical Arts contract | $120, 000. 00 |
| Demand note for loan to purchase First and Seneca Building | 18, 000. 00 |
| Demand note for purchase of Wilkeson stock and notes | 24, 500. 00 |
| Demand note for purchase of General debentures | 24, 671. 50 |
| Demand note for funds to loan to Wilkeson | 20, 000. 00 |
| Demand note for loan to purchase Bremerton parking lot | 30, 000. 00 |
| Demand note for loan to purchase Colonial and Grand Pacific Buildings (only outstanding since June 7, 1966) | 100, 000. 00 |
| Demand notes for loans for miscellaneous improvements to real estate | 109, 500. 00 |
| Miscellaneous open account advances | 59, 000. 00 |
| Total | 505, 617. 50 |

Timber has not claimed any deductions for interest as the result of the loans to it by the petitioner, and the petitioner has not received or accrued any interest income 'from these loans. However, Timber, which computes its income on the basis of a fiscal year ending June 30, claimed deductions for interest paid on the loan by the Washington Mutual Savings Bank in the amounts of $479.57, $5,921.58, and $6,-909.35, for its fiscal years ending in 1966, 1967, and 1968, respectively. Timber received interest income of $4,441.13, $4,223.32, and $3,682.83, for its fiscal years 1966, 1967, and 1968, respectively. During these fiscal years, Timber has had the following gross income and net losses:

| FYE | Gross income | Net loss |
|---|---|---|
| 6/30/66 | $174,352.38 | $17,575.40 |
| 6/30/67 | 196,955.75 | 8,894.51 |
| 6/30/68 | 185,402.33 | 20,049.68 |

The proceeds of the loans or other indebtedness owed by Timber to the petitioner may be traced as follows:

| Asset | Amount of debt | Gross income realized by Timber from assets | | |
|---|---|---|---|---|
| | | Fiscal year 1966 | Fiscal year 1967 | Fiscal year 1968 |
| Medical Arts Building | $177,500.00 | $111,154 | $115,145 | $107,798 |
| First & Seneca Building | 54,000.00 | 21,435 | 22,744 | 23,558 |
| Medical Arts and First & Seneca | 16,000.00 | (1) | (1) | (1) |
| Wilkeson common and preferred stock and notes purchased | 24,500.00 | | | |
| Common stock | | None | None | None |
| Preferred stock and notes | | (2) | (2) | (2) |
| Wilkeson note for loan | 20,000.00 | 3 2,875 | 3 2,775 | 3 450 |
| General debentures | 24,617.50 | (2) | (2) | (2) |
| Southcourt Apartments parking lot | 30,000.00 | 4 35,567 | 4 36,510 | 4 36,655 |
| Colonial and Grand Pacific Buildings | 100,000.00 | 770 | 16,852 | 13,142 |
| Open account | 59,000.00 | (5) | (5) | (5) |
| Total | 505,617.50 | 171,801 | 194,026 | 181,603 |

1 Included above.
2 Proceeds and income not traceable.
3 These amounts were received by Timber as interest on loans to Wilkeson. However, prior to 1966, Timber made other loans to Wilkeson, and some loans were repaid. It may be argued that these amounts of interest are not attributable to the loan made with the funds borrowed from the petitioner, but the petitioner has not provided any evidence to establish that these amounts of interest were attributable to other loans.
4 These figures represent the total income from the Southcourt Apartments. No segregation was made to indicate what part of the income was due to the parking lot.
5 Investment in assets not shown.

During each of the years 1966, 1967, and 1968, there were outstanding loans by the petitioner of less than $9,000 to the Calces Corp., which it controlled. These loans bore interest at the rate of 6 percent.

In his notice of deficiency, the respondent determined that, under section 482, the petitioner's income should be increased for the years 1966 and 1967 by an amount equal to 5 percent of the interest-free indebtedness owed by Timber to the petitioner, that such adjustments were necessary to prevent the evasion of tax or clearly to reflect the

petitioner's income, and that correlative adjustments would be made in the returns of Timber.

OPINION

The issue for decision is whether the respondent was authorized under section 482 to allocate certain gross income from Timber to its parent, the petitioner. The basic contention of the respondent is that Timber realized gross income from the use of the funds which the petitioner lent it, and that because interest was not charged on the loans, some of the income received by Timber should be allocated to the petitioner in order to reflect clearly the income of the two corporations. The petitioner contends that the existence of interest-free loans does not provide a proper basis for the use of section 482 in allocating income from Timber to the petitioner. Neither party contends that the loans were in reality contributions to capital.

Section 482 provides that:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The purposes and effects of section 482 were described in *Pauline W. Ach*, 42 T.C. 114, 125–126 (1964), affd. 358 F. 2d 342 (C.A. 6, 1966), certiorari denied 385 U.S. 899 (1966):

Respondent may allocate income under section 482 in order to prevent "evasion of taxes or clearly to reflect the income." The legislative history of section 482 indicates that it was designed to prevent evasion of taxes by the arbitrary shifting of profits, the making of fictitious sales, and other such methods used to "milk" a taxable entity. * * * The Commissioner has considerable discretion in applying this section and his determinations must be sustained unless he has abused his discretion. We may reverse his determinations only where the taxpayer proves them to be unreasonable, arbitrary, or capricious. * * *

"In order to prevent the artificial shifting of income from one related business to another, section 482 places a controlled taxpayer on a parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true net income of a controlled taxpayer." *Huber Homes, Inc.*, 55 T.C. 598, 605 (1971); *Baldwin-Lima-Hamilton Corporation* v. *United States*, 435 F. 2d 182 (C.A. 7, 1970); *Oil Base, Inc.* v. *Commissioner*, 362 F. 2d 212, 214 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court, certiorari denied 385 U.S. 928 (1966); *Simon J. Murphy Co.* v. *Commissioner*, 231 F. 2d 639 (C.A. 6, 1956), reversing 22 T.C. 1341 (1954). For example, if a parent sells property to a subsidiary at a bargain

price and the subsidiary resells the property and realizes income, the respondent has the power to allocate gross income from the subsidiary to the parent. *Eli Lilly & Co.* v. *United States*, 372 F. 2d 990 (Ct. Cl. 1967); *Asiatic Petroleum Co.* v. *Commissioner*, 79 F. 2d 234 (C.A. 2, 1935), affirming 31 B.T.A. 1152 (1935), certiorari denied 296 U.S. 645 (1935); see *Jesse E. Hall, Sr.*, 32 T.C. 390, 408–410 (1959), affd. 294 F. 2d 82 (C.A. 5, 1961). The income so allocated was, in reality, not earned by the subsidiary but by the parent, and the realization of such income by the subsidiary was the result of the parent and subsidiary not dealing with each other as unrelated taxpayers. Cf. *Philipp Brothers Chemicals, Inc. (N.Y.)* v. *Commissioner*, 435 F. 2d 53, 57 (C.A. 2, 1970), affirming 52 T.C. 240 (1969); *Grenada Industries, Inc.*, 17 T.C. 231, 256–258 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953); 7 Mertens, Law of Federal Income Taxation, sec. 38.61, p. 159. Of course, if the subsidiary does not resell the property or realize gross income from its use or resale, there is no gross income to be allocated to the parent arising out of the transaction. See *E. C. Laster*, 43 B.T.A. 159 (1940), affirmed on this issue 128 F. 2d 4 (C.A. 5, 1942); *Texsun Supply Corporation*, 17 T.C. 433 (1951).

The respondent takes the position that when one related person loans money to another related person without charging interest, the arrangement is like a bargain sale not made at arm's length, and that, in order to reflect clearly the income of both parties, an allocation should be made to the lender of some of the gross income which the borrower realizes from the use of the proceeds of the loan. We agree. When a related party makes a bargain sale, it has done all that is necessary to be done to realize the fair market value of the item sold except charge an arm's-length price, and the appropriate portion of the profit which the purchaser realizes in reselling the item at its fair market value may be allocated to the seller. See *Asiatic Petroleum Co.* v. *Commissioner, supra*. Similarly, when a related party makes an interest-free loan, it has done all that is necessary to realize interest income, except charge interest; and some of the gross income which the borrower realizes from the use of the proceeds of the loan has, in reality, been earned by the funds of the lender. The regulations under section 482 provide for adjustments when one related person makes an interest-free loan to another related person, as well as when there are bargain sales between related persons. Section 1.482–2(a)(1), Income Tax Regs., states:

(a) *Loans or advances*—(1) *In general.* Where one member of a group of controlled entities makes a loan or advance directly or indirectly to, or otherwise becomes a creditor of, another member of such group, and charges no interest, or

charges interest at a rate which is not equal to an arm's length rate * * *, the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan or advance.

Such provision of the regulations has been approved and applied to an interest-free loan in *B. Forman Co., Inc.* v. *Commissioner*, 453 F.2d 1144 (C.A. 2, 1972), reversing on another issue 54 T.C. 912 (1970). Thus, we conclude that if the borrower realizes gross income from the use of the loaned money, some of that gross income should be allocated to the lender in order to reflect clearly the income of both related parties. This has also been the conclusion of a number of commentators. Anderson, "Reexamination of Commissioner's Powers to Reallocate Income and Expenses Among Related Entities Under Section 482," 1958 So. Cal. Tax Inst. 343, 355; Asbill, "The Application of Section 482 to Domestic Taxpayers—Current Status and Trends," 1967 So. Cal. Tax Inst. 673, 696; Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 15.06, p. 15–26; Plumb & Kapp, "Reallocation of Income and Deductions Under Section 482," 41 Taxes 809, 814 (1963).

In the present case, the respondent determined that gross income in an amount equal to 5 percent of the total loans outstanding during both 1966 and 1967 should be allocated from Timber to the petitioner. Because the petitioner does not contend that the 5-percent figure is an unreasonable one to use or that the loans were made at arm's length, our inquiry is limited to whether the petitioner has shown that the loans did not produce gross income in 1966 and 1967. Some of the proceeds of the loans were invested in properties producing gross income, some were invested in non-income-producing stock, and some were not traced to any assets by either party. As to the funds which were invested in properties which produced gross income, we sustain the respondent's determination.[2]

In one transaction, the petitioner loaned funds to Timber which Timber loaned to Wilkeson at a 6-percent interest rate. During 1966 and 1967, Timber received interest income from Wilkeson, although there is some uncertainty as to whether the outstanding loans to Wilkeson included the one traceable to the funds furnished by the petitioner. (See fn. 3 to table, p. 483.) As a result of this transaction, there was a clear shifting of income in some years. So far as we know, there was no reason for the petitioner to advance the money to Timber so that Timber could make the loan to Wilkeson; there is no explanation of why the petitioner did not make the loan directly to Wilkeson.

---

[2] Timber was on a fiscal year basis while the petitioner was a calendar year taxpayer. With no evidence to the contrary being presented by the petitioner, we presume that Timber realized one-half of its yearly income every 6 months. Therefore, there would be sufficient gross income from each asset in 1966 and 1967 to support an allocation.

By using the circuitous route to make the loan, the petitioner shifted the interest income earned by its funds from itself to Timber. Clearly, the respondent was authorized by section 482 to allocate that interest income to the petitioner if the loan traceable to the funds furnished by the petitioner was still outstanding in 1966 and 1967. Cf. *Asiatic Petroleum Co.* v. *Commissioner, supra.* If that loan was not outstanding in 1966 and 1967, the allocation by the respondent is governed by the later discussion of allocations where the proceeds of the loans to Timber were not traced.

In several other transactions, the loaned funds were not reloaned but were invested in other assets which produced gross income. The petitioner loaned Timber $18,000, which was used to acquire the First and Seneca Building, $100,000, which was used to acquire the Colonial and Grand Pacific Buildings, and made no effort to collect on its $120,000 claim against the Medical Arts Building. The funds supplied by the petitioner for the purchase of the First and Seneca, Colonial, and Grand Pacific Buildings constituted all, or almost all, of the equity furnished by Timber for those purchases. Again, there is no evidence as to why the petitioner did not acquire these buildings itself, rather than arrange for Timber to do so. Whatever the reason for arranging these transactions in the form they took, the effect was to shift profits from the petitioner to Timber in a manner that would not have occurred if they had been dealing at arm's length. Interest income that would have been charged on arm's-length loans was not received by the petitioner; on the other hand, the potential income of Timber was increased since it could not deduct any interest payments.

Other loans also had the effect of artificially shifting profits from the petitioner and reducing the potential profits of Timber. For example, if the funds to purchase the parking lot for the Southcourt Apartments had been borrowed from an outsider, interest would have been payable, and if the petitioner had loaned such funds to an outsider, interest would have been receivable. Thus, the making of an interest-free loan reduced the petitioner's income and increased Timber's income from the operation of the Southcourt Apartments, when compared with the consequences of an arm's-length transaction. Similarly, the loans to provide funds for the improvements on the Medical Arts Building and the First and Seneca Building, since no interest was charged on them, distorted the income of the petitioner and Timber, when compared with the results of an arm's-length loan.

In computing his adjustments with respect to the funds that were invested in assets producing rental income, the respondent effected his allocation by increasing the petitioner's income by the amount of 5 percent of the outstanding loans, representing the interest that

would have been realized on such loans if they had been made at arm's length. He has indicated that Timber's income should be recomputed by allowing it deductions for similar amounts of interest. Under section 482, the respondent is authorized to allocate gross income or deductions if he determines that such allocation is necessary clearly to reflect the income of the related persons. In this case, profits of the petitioner were artificially shifted to Timber by making loans to it, without charging an arm's-length interest for the loans, to acquire or improve the rental properties. Thus, by treating the parties as if interest had been received and deducted, the respondent has adjusted their incomes to reflect the changes that would have occurred if the transactions had occurred at arm's length. By making these adjustments, the incomes of both the petitioner and Timber have been properly computed by applying the arm's-length standard to them. *Grenada Industries, Inc., supra.* This method of making the adjustments is similar to that used when one related party sells property to another related party for less than its fair market value. In that situation, the seller is treated as having charged an arm's-length price and the buyer as having paid an arm's-length price. See *Baldwin-Lima-Hamilton Corporation* v. *United States, supra* at 186–187; *Eli Lilly & Co.* v. *United States, supra* at 997; see also *G.U.R. Co.*, 41 B.T.A. 223, 226 (1940), affd. 117 F. 2d 187 (C.A. 7, 1941). The method is also similar to that used when one related party rents property to another related party for less than its fair market value. In that situation, the respondent increases the income of the lessor and decreases the income of the lessee by allowing it increased rental deductions. *South Texas Rice Warehouse Co.*, 43 T.C. 540, 559, 566 (1965), affd. 366 F. 2d 890 (C.A. 5, 1966), certiorari denied 386 U.S. 1016 (1967); *Welworth Realty Co.*, 40 B.T.A. 97 (1939).

As to the funds which were not traced, the outcome depends upon whether the petitioner had the burden of showing that they did not result in the production of gross income or whether the respondent had the burden of showing that they did result in the production of such income. It is an elementary rule of tax jurisprudence that, in the absence of a specific exception, the petitioner has the burden of proving that the determination of the respondent is incorrect. See, e.g., Rule 32, Tax Court Rules of Practice; *Carroll F. Schroeder*, 40 T.C. 30, 33 (1963) (determination of amount of "tip" income by a percentage formula); *Thomas J. Barkett*, 31 T.C. 1126, 1128 (1959) (determination that substantial funds of an organization were used to influence legislation); *Estate of Henry Wilson*, 2 T.C. 1059, 1085 (1943) (determination of an estate tax deficiency); *Brillo Manufacturing Co., Inc.*, 9 B.T.A. 663, 664 (1927) (determination of value

of property). Thus, for example, if the respondent determines that the sale of stock from father to son was not bona fide and that dividends from the stock should be taxed to the father, the petitioner has the burden of proving that the sale was bona fide. *Gouldman* v. *Commissioner*, 165 F. 2d 686, 690 (C.A. 4, 1948), affirming a Memorandum Opinion of this Court. If the respondent determines that under section 269 separate surtax exemptions for related corporations should not be allowed, the taxpayer must show that such disallowance was arbitrary, unreasonable, or capricious. *Napsky* v. *Commissioner*, 371 F. 2d 189 (C.A. 7, 1966), affirming a Memorandum Opinion of this Court. Similarly, if the respondent determines that a taxpayer's accounting method does not clearly reflect income and that section 446(b), therefore, permits him to compute the taxpayer's income under a different method of accounting, the taxpayer, who contends that the section is inapplicable, has the burden of proving that its method of accounting is proper. *David Courtney*, 28 T.C. 658, 665 (1957) ; see *William O'Dwyer*, 28 T.C. 698, 705 (1957), affd. 266 F. 2d 575 (C.A. 4, 1959), certiorari denied 361 U.S. 862 (1959).

Section 482 gives the respondent broad authority to act when in his judgment it is necessary to prevent tax evasion or clearly to reflect income, and accordingly, it has been uniformly held that a section 482 allocation will not be modified unless the petitioner proves that the allocation was arbitrary, unreasonable, or capricious. *Baldwin-Lima-Hamilton Corporation* v. *United States*, 435 F. 2d at 185; *Philipp Brothers Chemicals, Inc. (N.Y.)* v. *Commissioner*, 435 F.2d at 57; *Oil Base, Inc.* v. *Commissioner*, 362 F. 2d at 214; *Spicer Theatre, Inc.* v. *Commissioner*, 346 F. 2d 704, 706 (C.A. 6, 1965), affirming 44 T.C. 198 (1964) ; *Huber Homes, Inc.*, 55 T.C. at 605–606; *Marc's Big Boy-Prospect, Inc.*, 52 T.C. 1073, 1092 (1969), affirmed sub nom. *Wisconsin Big Boy Corp.* v. *Commissioner*, 452 F. 2d 137 (C.A. 7, 1971) ; *South Texas Rice Warehouse Co.*, 43 T.C. at 564; *Grenada Industries, Inc.*, 17 T.C. at 255; *Welworth Realty Co.*, 40 B.T.A. at 101. Thus, in one case involving the predecessor of section 482, this Court stated:

Exact records of the costs of the operations of each of the companies might have shown a result different from that reached by the respondent, but, admittedly, no such records were kept and could not now be established. Thus, the petitioner is itself responsible for the absence of proof upon which the respondent's determination might be challenged. [*Leedy-Glover Realty & Insurance Co.*, 13 T.C. 95, 107 (1949), affirmed per curiam 184 F.2d 833 (C.A. 5, 1950).]

Placing such a burden on the petitioner is not only in accord with the general concept of the burden of proof in tax cases, but also encourages the keeping of accurate records. In contrast, if the burden were on the respondent, he would, in large part, have to rely on the records

of the taxpayer in attempting to trace the fungible proceeds of a loan, and a taxpayer whose records did not show how specific funds were used would have an advantage over a taxpayer who maintained complete records. Therefore, we conclude that the petitioner had the burden of proving that the funds loaned without interest did not result in the production of gross income during the years 1966 and 1967.

The funds not traced include those which were originally invested in stock, debentures, and notes, that were sold, redeemed, or paid in full before 1966, and advances on open account that were made prior to 1966, and used for advances to tenants, investments, and current operating expenses. Although some of the advances were made to pay for expenses in years other than 1966 and 1967, no evidence has been presented to enable this Court to determine with any degree of reliability what amount of the advances were used in years prior to 1966. Cf. *Aaron Michaels*, 12 T.C. 17, 19 (1949). As to funds not traced, we also sustain the respondent's determination.

As to funds which were shown to have been invested in the non-income-producing stock, we find that the petitioner has met its burden of proof. In *B. Forman Co., Inc.* v. *Commissioner, supra*, the court upheld the respondent's determination increasing the taxpayer's income as a result of interest-free loans which it made to a related person. The borrower had sustained a loss during the years in issue, but the Court of Appeals seemed to indicate that section 482 could be applied irrespective of whether the borrower had income during the year. Despite such indication by the court, the borrower did in fact apparently receive gross income during the year. In *Huber Homes, Inc., supra*, we held that there could be no allocation of income under section 482 when, so far as could be determined on the record of that case, the members of the controlled group did not realize income as a result of the transactions in issue. This Court is not now convinced that it should change its position in *Huber Homes*, and based on that decision, we hold that the respondent lacked legal authority to make an adjustment under section 482 as to the funds which did not produce gross income during the years 1966 and 1967.

In summary, we hold that in 1966, $22,704 of gross income should be allocated from Timber to the petitioner, and that in 1967, $24,868.38 should be allocated.

In reaching this holding, we have carefully considered the several contentions made by the petitioner. The first contention is that under *Smith-Bridgman & Co.*, 16 T.C. 287 (1951), the allocation of gross income from Timber to the petitioner is in reality the "creation of income" and not authorized under section 482. However, in *Smith-Bridgman*, the borrowing corporation used the loan proceeds to retire outstanding debentures and apparently had no gross income as a re-

sult of the loan which could be allocated. Indeed, the Commissioner in that case did not even attempt to allocate gross income from the borrowing corporation by reducing the income of that corporation. See *Tennessee-Arkansas Gravel Co.* v. *Commissioner*, 112 F. 2d 508 (C.A. 6, 1940), reversing a Memorandum Opinion of this Court. In the present case, there was gross income arising out of most of the loan transactions in 1966 and 1967 and, as evidenced by the correlative adjustment in Timber's income, gross income was allocated from Timber to the petitioner.

Similarly, the present case is also distinguishable from that of *Huber Homes, Inc.*, *supra*, where a parent corporation sold houses at cost to its subsidiary which leased them to the public. The Commissioner increased the parent's gross income by the difference between the fair market value of the houses it sold and the price at which it sold the houses to the subsidiary and increased the subsidiary's basis in the houses. In finding that the Commissioner's determination was not authorized under section 482, the Court noted at page 607 that "the Commissioner does not here contend that any of * * * [the subsidiary's] gross rental income was not earned by it or that any portion of *its* income should be allocated to Huber Homes [the parent]." The Court also stated at page 610, perhaps in anticipation of a case like the present one, "But if, as a consequence of * * * use or consumption by the transferee [of goods or services transferred to it at less than arm's-length prices], income is realized within the controlled group, an entirely different question would be presented."

In *PPG Industries, Inc.*, 55 T.C. 928 (1970), the Court held that the Commissioner had exceeded his authority in allocating gross income from the subsidiary to the parent because the Court found that not even the most tenuous tie existed between the interest-free loans and the subsidiary's gross income in the year in question. Except as to the non-income-producing stock, no such finding can be made in this case.

In further support of its contention that the respondent "created" income, the petitioner cites cases where the corporation made loans to its shareholders or a subsidiary and the parties never intended to create any liability for interest. See, e.g., *Brandtjen & Kluge, Inc.*, 34 T.C. 416 (1960); *Society Brand Clothes, Inc.*, 18 T.C. 304 (1952); *Combs Lumber Co.*, 41 B.T.A. 339 (1940). See also *Atchison, Topeka & Santa Fe Railway Co.*, 36 T.C. 584 (1961). In those cases, no contention was made as to the applicability of section 482, and the courts held that the corporations need not accrue interest income. In the present case, the respondent is not contending that the petitioner should accrue interest income under section 61, but that some of the gross income which was realized by Timber from the use of the loan proceeds

should be allocated to the petitioner under section 482. Thus, the cited cases are distinguishable from the present case.

The petitioner also made the contention that the income tax liability of Timber and the petitioner would have been less if they did business as one corporation and that, therefore, no allocation is needed to prevent the evasion of taxes or to properly reflect income. Even assuming that the tax liability would be less if there was only one corporation, we can find neither legislative nor judicial support for the petitioner's contention. Cf. Tillinghast, "The Application of Section 482 to International Operations: Inter-Company Pricing Problems," 24th Ann. N.Y.U. Tax Inst. 1433, 1435–1436 (1966). To agree with the petitioner would be to permit a parent to disregard the standards of section 482 in dealing with its subsidiary as long as the subsidiary had a net loss even though such dealings could distort the incomes of both related parties by causing gross income which was earned by the parent to be realized by the subsidiary. See Bittker & Eustice, *supra* at 15, 22, 23. Furthermore, transactions in one taxable year may affect the tax liabilities of the related persons in preceding or succeeding taxable years. Consequently, even though their income, figured on a consolidated basis, for the years in issue would have been less, we cannot ignore the fact that they were separate legal persons, that they apparently were not entitled to file consolidated returns in the years in question (sec. 542(b)(2)), and that their transactions may produce different results in other taxable years.

The petitioner's next contention is that expenses must be allocated with gross income and that because Timber had net losses in 1966 and 1967, the allocation from Timber to the petitioner should reduce rather than increase the petitioner's taxable income. The wording of the statute clearly states that "gross income" may be allocated and does not require that losses be allocated if the corporation from which income is allocated has a net taxable loss for the year in question. The only basis which the petitioner gives for allocating losses is the following statement in *Huber Homes, Inc.*, 55 T.C. at 605: "in the present case Huber Investment [the subsidiary] has not received any income— indeed, it has sustained losses—which was earned by petitioner and should be 'allocated' to it." We read this sentence not to say that losses should be allocated, but to say that in *Huber Homes* the subsidiary did not realize any income which was earned by or should be allocated to the parent. Moreover, this is not a situation in which the respondent is allocating income but refuses to allocate related expenses or deductions. By increasing the petitioner's income by an amount equal to the interest that would have been payable on the loans if they had been made at arm's length, and by allowing Timber deductions for interest that would have been payable on arm's-length loans, the respondent is adjusting the income of both parties to reflect fully the

consequences that would have occurred in arm's-length transactions. He is not denying the petitioner any expenses that were related to or would have been incurred as a result of the receipt of such interest.

The petitioner's final contention seems to be that the respondent's notice of deficiency referred to the allocation under section 482 of "interest income," that Timber did not have interest income arising from the interest-free loans, and that section 482 is, therefore, inapplicable because the respondent is bound by his notice and can only allocate "interest" income. While the notice might have been more artfully worded, we believe it put the petitioner on sufficient notice of the basis of the deficiency. In fact, the petitioner does not even contend that it was surprised by the position taken by the respondent in his opening statement at trial or in his brief. In both instances, the respondent stated that *gross* income measured by 5 percent of the loans outstanding during each year was being allocated. In addition, the petitioner does not contend that it would have presented different evidence if the notice had been worded in terms of *gross* income rather than *interest* income. Under these circumstances, we find that the respondent was not prohibited from utilizing section 482 to allocate gross income. Indeed, this Court has allowed the respondent to rely on section 482 even though it was not mentioned in the notice of deficiency or the pleadings, where it was shown that the petitioner was not surprised by the respondent's reliance on the section. *Richard Rubin*, 56 T.C. 1155, 1163 (1971); *Nat Harrison Associates, Inc.*, 42 T.C. 601, 617–618 (1964); compare *Richard R. Riss, Sr.*, 57 T.C. 469 (1971) (where the applicability of sec. 482 was not raised until the respondent's brief and it was found that the petitioner was, thereby, substantially prejudiced); cf. *John R. Holmes*, 57 T.C. 430 (1971); *Tirzah A. Cox*, 56 T.C. 1270, 1277 (1971).

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

IRWIN, *J.*, concurring: I agree with the result reached in this case but wish to add some comments in light of my case, *Kahler Corp.*, 58 T.C. 496 (1972), which was also approved by the Court this day.

Both cases involved the application of section 482 to situations where interest-free advances passed between related parties. However, the tack followed by the Commissioner in the two differed and I am concerned that this may be a cause for confusion and obscure the common ground which exists between the two opinions.

In both *Kerry* and *Kahler*, we affirmed this Court's previous position in this area: namely, that the Commissioner cannot utilize section 482 to "create" income solely by imposing arm's-length dealing on re-

lated parties where his only allegation is that there were interest-free advances between the parties. In *Kerry*, however, we are going one step farther because respondent not only attempted to allocate non-existent interest income per se as in *Kahler*, he in addition sought to allocate *income* generated by the Kerry subsidiary from the *use and consumption* of the interest-free funds.

Consistent with *Smith-Bridgman & Co.*, 16 T.C. 287 (1951), acq. 1951-1 C.B. 3; *PPG Industries, Inc.*, 55 T.C. 928 (1970); and *Huber Homes, Inc.*, 55 T.C. 598 (1971), the former type of allocation is again rejected in both *Kerry* and *Kahler*. The latter type of allocation, however, that of *income* generated from the *use and consumption* of the interest-free advances, is approved in *Kerry* because it is an allocation of income from one related party to another and is not an allocation of nonexistent interest. *Kerry* is the first case before this Court in which we have been faced with the application of section 482 to an improper deflection of income caused by the *use or consumption* of interest-free advances. We are holding, on the particular facts of *Kerry*, that the Commissioner acted reasonably under the authority of section 482 with respect to this allocation of *income* where the interest-free advances were used and consumed by the subsidiary-borrower to purchase income-generating assets. The respondent urged this approach in *Kerry*. He did not do so in *Kahler*.

FORRESTER, *J.*, agrees with this concurring opinion.

---

FEATHERSTON, *J.*, dissenting: In my opinion, the tracing concept here adopted by the majority is inconsistent with the language of section 482 and its implementing regulations.

Section 482 authorizes the Secretary to "distribute, apportion, or allocate gross income, deductions, credits, or allowances" between related organizations "if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations." Nothing in this language limits the authorization to situations in which the non-arm's-length transaction produces taxable income in the tax year.

Section 1.482-1(b), Income Tax Regs., declares that the purpose of section 482 is to permit the determination of the "true taxable income" of a controlled taxpayer. Section 1.482-1(a)(6), Income Tax Regs., defines "true taxable income" as follows:

(6) The term "true taxable income" means, in the case of a controlled taxpayer, the taxable income (or, as the case may be, any item or element affecting taxable income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. It does not mean the income, the deductions, the credits, the allowances, or the item or element of income, deductions, credits, or allowances, resulting to the controlled taxpayer by reason of the particular

contract, transaction, or arrangement, the controlled taxpayer, or the interests controlling it, chose to make (even though such contract, transaction, or arrangement be legally binding upon the parties thereto).

Section 1.482–2(a) of the regulations deals specifically with "loans or advances" as a factor in the determination of true taxable income. It provides that where one member of a group of controlled entities makes a loan or advance to another—

and charges no interest, or charges interest at a rate which is not equal to an arm's length rate * * * the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan or advance.

Section 1.482–1(d)(4) of the regulations, dealing with methods for reallocating gross income and deductions, further provides in part:

if one member of a group lends money to a second member of the group in a taxable year, the district director may make an appropriate allocation to reflect an arm's length charge for interest during such taxable year even if the second member does not realize income during such year. The provisions of this subparagraph apply even if the gross income contemplated from a series of transactions is never, in fact, realized by the other members.

As I read section 482 and these regulations, the applicability of that section does not depend upon the realization of pretax profits from a particular non-arm's-length transaction or, in the case of borrowed funds, the use to which they are placed. The section refers to "gross income" and "deductions" and does not specify the source from which they may be derived. To justify an interest allocation where the borrowing organization is producing gross income, it is necessary only that the waiver of interest would not have been made "had the taxpayer in the conduct of * * * [its] affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Sec. 1.482–1(c), Income Tax Regs.

I fail to see how the tracing concept, which involves an analysis of the borrowing corporation's use of the advanced funds and the financial results of such use during the tax years, can be squared with these regulations. Moreover, I think the concept gives birth to a mischievous rule. Apart from the endless disputes it will engender as to whether particular uses of the borrowed funds (e.g., to pay overhead, capital expense, long-term investments, etc.) produced income during the tax years, it places a premium on accounting sophistication and lays a "trap for the unwary." By the simple expedient of investing the particular borrowed dollars in nonproductive assets, section 482 can be circumvented even though such investment releases other funds for income-producing uses. On the other hand, if the borrower is not aware of this limitation which the majority is writing into the regulations and mingles the borrowed dollars with other capital, section 482 may be applied.

In most situations, commonly controlled corporations are subject to the same tax rates, and there is no compelling reason to apply section

482. However, there are situations in which section 482 can be a useful tool to prevent tax "evasion" and to clearly reflect income (e.g., where one member of the controlled group is subject to the accumulated-earnings tax, where one is a foreign corporation, where one is a personal holding company, where one has operating losses and the other gains,[1] where a precise computation of earnings and profits of one of the corporations is important, etc.). Rather than lay down a rule which places such a premium on skillful bookkeeping, I would prefer to see the regulations declared invalid in the expectation that Congress would then focus on the problem.

However, I think the regulations are consistent with the section. They have been sustained in *B. Forman Co.* v. *Commissioner,* 453 F. 2d 1144 (C.A. 2, 1972). After reviewing several cases—most of them decided before the 1968 regulations were issued—the court said (at p. 1156):

> To the extent that the above cases cited by taxpayers may be read as holding that no interest can be allocated under § 482 under the facts of this case, they are not in accord with either economic reality, or with the declared purpose of section 482. They seriously impair the usefulness of § 482. Those cases may be correct from a pure accounting standpoint. Nevertheless, interest income may be added to taxpayers' incomes, as long as a correlative adjustment is made * * *, for then the true taxable income of all involved will be properly reflected. * * *

I do not think the majority satisfactorily distinguishes the principles underlying the *Forman* decision, and I think we should follow it. I respectfully dissent from the majority's holding that interest reallocations may not be imputed with respect to the funds invested in non-income-producing stock.

---

[1] Loss corporations present prime opportunities for the shifting of profits among members of the group, and the Commissioner is unquestionably authorized by sec. 482 to correct distortion of their income. See, e.g., *Likins-Foster Honolulu Corp.* v. *Commissioner,* 417 F.2d 285, 292 (C.A. 10, 1969), certiorari denied 397 U.S. 987 (1970) ; *Baldwin-Lima-Hamilton Corp.* v. *United States,* 435 F.2d 182, 185 (C.A. 7, 1970).