UNITED STATES STEEL CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
United States Steel Corp. v. Commissioner
Docket No. 5786-72.
United States Tax Court
T.C. Memo 1977-140; 1977 Tax Ct. Memo LEXIS 300; 36 T.C.M. (CCH) 586; T.C.M. (RIA) 770140; May 11, 1977, Filed *300 Petitioner organized a United States corporation to mine an iron ore deposit in Venezuela. When the production stage of the mine was reached, petitioner then organized a Liberian shipping corporation to transport the ore from Venezuela to United States and foreign ports. The mining company established a price for the ore F.O.B. Puerto Ordaz, Venezuela, which was available to the petitioner as well as any unrelated customers. The shipping company established rates for the transportation of the ore to United States and foreign ports, which rates were likewise available both to the petitioner and unrelated purchasers of ore. The shipping rates to United States ports were established at levels in order that the sum of the price of the ore F.O.B. Puerto Ordaz and the carrier's charges to deliver the ore to United States ports would be comparable with the price of domestic ores. That price was predicated on the published or announced price of iron ore on lower Lake Erie. The shipping charges exceeded the rates which would have been charged by independent or third party carriers hauling ore from Puerto Ordaz to United States ports under comparable conditions. Held: Respondent is not precluded *301 from invoking section 482 in order to allocate a portion of the shipping charges as between the petitioner and its related carrier by reason of the fact that the delivered cost of the ore did not exceed the published price for domestic ore in the lower Lake Erie market. Further Held: The petitioner was not subject to any legal constraints which would prevent the petitioner from negotiating and obtaining lower rates for the transportation of its ore from Puerto Ordaz to United States ports. The fact that the offering of such ore at a combined cost below the lower Lake Erie price might disrupt or force a reduction in the lower Lake Erie market does not preclude the application of section 482. The amount to be allocated pursuant to section 482 for the taxable years involved was determined by the Court. A. Chauncey Newlin,Haliburton Fales, 2d,David Sachs, and Allan L. Gropper, for the petitioner. Powell W. Holly, Jr.,D. Ronald Morello,William K. Carr, and Alfred C. Bishop, Jr., for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: The respondent determined deficiencies in income taxes due from petitioner as follows: Year
Deficiency
1957
$11,100,174.68
1958
$10,272,076.07
1959
$ 9,884,214.27
1960
$16,814,959.53
By *302 agreement of the parties the only issue for decision at this time relates to the question whether there should be allocated to the petitioner under section 482[1] a portion of the charges made by its subsidiary for the transportation of iron ore from Venezuela to United States ports. Respondent contends that such charges were excessive and that the income therefrom should be allocated, in part, to the petitioner under section 482 in order to prevent the distortion of income and the evasion or avoidance of taxes by related corporations. This opinion is directed solely to that issue. In his notice of deficiency, the respondent proposed to allocate to the petitioner pursuant to section 482 the following amounts: Year
Amount
1957
$11,072,585
1958
13,042,107
1959
13,624,330
1960
14,402,384
Total
$52,141,406
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. United States Steel Corporation (petitioner) is a Delaware corporation and at the time of filing its petition in this case had a principal office *303 at 71 Broadway, New York, New York 10006. On January 1, 1966, petitioner's predecessor corporation, United States Steel Corporation, a New Jersey corporation, was merged into a wholly owned Delaware subsidiary with the same name, which is now petitioner. Prior to the merger petitioner's predecessor had its principal office at 71 Broadway, New York, New York 10006. For present purposes the predecessor New Jersey corporation is also referred to as "petitioner" with respect to events occurring prior to January 1, 1966. For the calendar years 1957 and 1958, petitioner filed its Federal income tax returns with the District Director of Internal Revenue, Lower Manhattan, New York. For the calendar years 1959 and 1960, petitioner filed its Federal income tax returns with the District Director of Internal Revenue, Manhattan District, New York, New York. During the taxable years involved in this proceeding, the principal business of the petitioner consisted of the production of steel and of finished or fabricated steel products, including the fabrication of structural steel for buildings, bridges, storage tanks and other structures. Such business encompassed the mining of iron ore, the *304 transportation of such ore from the mine to the mill, the operation of sheet strip and tin mills, the manufacture of plates, structural steel, bars and rods, pipe and tubing, and the erection or installation of such products. Such operations were conducted both by divisions of the petitioner and by subsidiary corporations. In the 1940's, in order to relieve demand on diminishing domestic supplies of iron ore, petitioner embarked on a search for new sources of ore overseas. Extensive deposits of iron ore were discovered in 1947 in an undeveloped and inaccessible area of the State of Bolivar in northeastern Venezuela. Orinoco Mining Company (hereinafter referred to as Orinoco) is a corporation organized by petitioner under the laws of the State of Delaware on December 30, 1949, to develop and operate those deposits. Petitioner originally paid in $10 million for 100,000 shares of the capital stock of Orinoco. In 1954 petitioner paid in an additional $20 million for 200,000 shares of the capital stock of Orinoco. Thereafter, petitioner advanced funds on open account to Orinoco without interest in order to provide the additional funds required by Orinoco for the development of the *305 iron ore deposits at Cerro Bolivar. Concurrently with the development of the mining properties in Venezuela, petitioner was required to develop a method for transporting the ore to consuming markets. Alternative proposals considered were the construction of a railroad from the mine to the open sea on the northern coast of Venezuela and the construction of a much shorter railroad from the mine site to a loading port, Puerto Ordaz, at the confluence of the Orinoco and Caroni Rivers. There new port facilities would be constructed, and the ore would be shipped overseas in ocean-going vessels, traversing a 184-mile channel to the sea to be dredged through the Macareo branch of the Orinoco, River. The petitioner, with the approval of the Venezuelan government, selected the combined rail and river route. Orinoco entered into a contract with the Venezuelan government to dredge and maintain a channel through the Macareo which would permit the passage of ocean-going ships loaded with iron ore. Orinoco thereupon undertook the construction of the necessary facilities at Puerto Ordaz, including wharfs, docks and ore-crushing, stockpiling and loading facilities. Petitioner simultaneously undertook *306 studies to determine the basis upon which the vessels required to haul the iron ore from Puerto Ordaz to U.S. ports could be obtained. At the outset, navigation in the Orinoco River from Puerto Ordaz to open water was restricted to a maximum fresh water draft of less than 25 feet. However, through additional dredging of the Orinoco River and the dredging of a sandbar at the mouth of the river, it was anticipated that ships ultimately would be able to operate for the full distance from Puerto Ordaz to open water at fresh water drafts up to 35 feet. Petitioner's plans thus provided for acquiring both existing vessels which could be operated at depths of up to 25 feet and for acquiring "super ore carriers" to be constructed which would operate at depths of up to 35 feet. At this time, the use of U.S. flag vessels to transport the iron ore from Puerto Ordaz to U.S. ports would result in increased operating costs of not less than 20 percent. The construction of vessels to be registered in the United States for transporting such ore, as compared to foreign flag vessels constructed abroad, would entail further increases in the costs of transferring such ore. As a practical matter, if not *307 as a matter of law, petitioner could not directly own and operate foreign flag vessels to transport the ore from Puerto Ordaz to U.S. ports. Similarly, the ownership and operation of such vessels by Orinoco would entail additional costs on account of the taxes imposed by the government of Venezuela. Accordingly, as a matter of considered business judgment, petitioner decided that the ore would be transported in foreign flag vessels under the operation and control of a foreign subsidiary of the petitioner organized for that purpose. It was further concluded that it would be advantageous, if possible, for that subsidiary to charter the vessels which would be required to haul the ore, rather than to acquire ownership thereof, in order to reduce the investment which would be required. In determining the method for marketing the ore to be mined by Orinoco, petitioner took into account various considerations. As a result petitioner decided that the ore would be priced F.O.B. Puerto Ordaz, Venezuela, and offered at such price to any purchaser for shipment either to Europe or to U.S. ports. The government of Venezuela had refused to grant any tax concessions to Orinoco. Pricing the ore *308 on that basis enabled Orinoco to establish, at least prima facie, a fair market value of the ore for purposes of Venezuelan taxation. During the years 1954 to 1960, inclusive, Orinoco sold ore to all of its customers, including petitioner, at the same price per ton F.O.B. Puerto Ordaz. At the same time, it was contemplated that the shipping subsidiary would establish fixed rates for the transportation of the ore to U.S. ports, as well as to ports in Europe, which would be available both to the petitioner and to nonrelated purchasers. In the United States the principal ore with which Orinoco ore competed and against which it was valued was Mesabi non-Bessemer ore. Mesabi ore was mined in Minnesota, and most of it was transported by rail to the upper Great Lakes, by ship to a receiving port on the lower Lakes, and then by rail to steel plants. During the 1957-1960 period, the price of Mesabi ore was set early each year in a large sale by one of the merchant sellers of ore, which seller was unrelated to petitioner, and the sale price was published and became widely known and quoted as the "lower Lake Erie" price for the year. The price of Orinoco ore and the "lower Lake Erie" price *309 of Mesabi ore was set on the basis of the physical and chemical qualities of the ores, including the iron ore "Fe" content, i.e., the percentage of iron contained in the ore. Petitioner was not willing to provide access to the Venezuelan ore on a delivered basis which would be below the delivered price of Mesabi ore.Accordingly, the transportation charges for delivery of the ore to United States ports were established as of April 1 of each year at a price per ton to U.S. ports which, when coupled with the F.O.B. price of the ore at Puerto Ordaz and port charges, would be compatible with the lower Lake Erie price for the Mesabi ore. [2] *310 In a document entitled "Specification for Long Term Contract Covering Carriage of Iron Ore, from Venezuela to U.S. Ports", prepared for issuance by Orinoco Mining Company under date of January 2, 1951, a proposal was outlined whereby carriers might submit bids (a) to construct and finance ships and (b) to operate such ships for the carriage of iron ore. The proposal contemplated total shipments aggregating 10 million gross tons of iron ore per annum, running from a primary period of 10 to 20 years with renewal options, to begin after January 1, 1954. At the outset, the channel of the Orinoco and Macareo Rivers would be dredged to a minimum of 26 feet below mean low tide, with the expectation that a channel of about 34 feet low water would be obtainable at a later date. The terms and conditions for the charter of such vessels were set forth in the proposed specification. By letter dated January 23, 1952, *311 petitioner transmitted a "Formal Inquiry for Long-Term Bareboat Charter and Management-Operating Contract" to various ship owners and operators. In response to that solicitation, Universe Tankships, Inc., (hereinafter sometimes referred to as Universe Tankships) submitted a proposal for the construction of a total of eight vessels, each capable of transporting a minimum annual cargo of 600,000 tons from Puerto Ordaz to the designated U.S. ports. Based upon the transportation of such tonnage, Universe Tankships, Inc., proposed a charge of $0.15 per cargo ton for management services, which would be reduced when the annual delivery per ship exceeded 600,000 tons per year. Subsequent negotiations with Universe Tankships, Inc., ultimately resulted in the construction of three of such ships pursuant to a contract of affreightment dated February 1, 1953. As a result of further studies, a document entitled "Formal Inquiry for Proposals of Charter-Hire for the Transportation of Venezuelan Iron Ore to United States Ports" was transmitted by petitioner under date of October 20, 1952, for interested parties to submit a schedule of charter rates for which the bidder would undertake the contract *312 carriage of iron ore from Venezuela to United States ports. In that proposal, the bidder was advised that the initial tonnage to be considered would be 2 million gross tons annually for a period of two years, subject to renewal on a year to year basis, with the expectation that contracts might be let for the carriage of up to a maximum of 5 million gross tons. In an addendum to the bid solicitation of October 20, 1952, the bidder was advised that the bids should be all inclusive, except for certain charges or costs which would be borne by the petitioner. Such charges consisted of all pilotage and towage charges in Venezuela; wharfage and similar port charges including river tolls in Venezuela; all import and export duties and taxes on ore cargo including fees for weighing and inspection of cargo for purpose of determining duties and taxes thereon; and all costs of loading, trimming, and unloading. In response to such solicitation, comparative rates quoted by certain selected bidders were, as follows: National Bulk [1]
Joshua Hendy [2]
Carriers
Corporation
Quoted Contract Prices - One Berth
Per G.T.
Only:
Philadelphia & Baltimore
$3.47
$3.75
Morrisville
3.47
3.75
Mobile
3.47
3.75
Demurrage Rate Per Hour
$250   $50   Despatch Rate Per Hour
250   10   Country of Registry
Liberia
British
Panama
Italy
Bid Firm Until
Feb. 1, 1953
Feb. 4, 1953
Length of Contract
3 years
2 years
Annual Tonnage
2,000,000
900,000 to 1,000,000
Type of Vessels
Super Collier
Liberty-Collier
Number of Vessels
Option of 2 or 3
7
Cargo Tons per Voyage
27,750
8,000
Eastern Gas &
Joshua Hendy
A.L. Burbank
Fuel
Corporation
& Company
Mystic S.S. Co.
C-4's
Quoted Contract Prices -
One Berth only:
Philadelphia & Baltimore
$6.00
5.46
$4.50
Morrisville
6.00
5.90
4.50
Mobile
6.00
5.59
4.50
Demurrage Rate Per Hour
$65   $75   $100   Despatch Rate Per Hour
25   25   10   Country of Registry
British-Greek
U.S.
U.S.
Panama-Liberia
American
Bid Firm Until
Feb. 2, 1953
Not Stated
Feb. 4, 1953
Length of Contract
2 years
2 years
2 years
Annual Tonnage
2,000,000
575,000
900,000 to 1,000,000
Type of Vessels
Liberty-Collier
Liberty-Collier
C-4 Converted
Number of Vessels
14 to 15
4
3
Cargo Tons per Voyage
8,000
Approx. 8,500
Est. 14,000
*313 In the Joshua Hendy bid, the offer was also made to undertake transfer of the C-4 vessels to foreign flag with a resulting decrease in the rate to not more than $3.75 per gross ton. Petitioner and Joshua Hendy Corporation entered into a contract of affreightment dated February 1, 1953, pursuant to which Joshua Hendy Corporation would supply seven vessels for a period of two years, commencing in the year 1954, to transport 1 million long tons of ore per year from Puerto Ordaz to designated ports in the United States serving the petitioner's mills. The contract provided a schedule of charges per ton of iron ore, regardless of port of destination, based upon the draft to which the ships were loaded, as follows: Draft
Per Ton Rate
25 feet
$3.75
26 feet
3.60
27 feet
3.45
28 feet
3.30
28 feet 4 inch
3.25
Petitioner and Universe Tankships, Inc., a Liberian corporation, entered into a contract of affreightment dated February 1, 1953, pursuant to which Universe Tankships would cause to be constructed two vessels capable of carrying up to a maximum of 47,500 d.w.t. at about 34 feet draft to *314 transport iron ore from Puerto Ordaz to designated ports in the United States serving petitioner's mills, on account of which petitioner would provide not less than 669,000 long tons per year of carriage for each vessel for a period of three years. To the extent that the vessel was required to discharge a part of its cargo either at Philadelphia, Pennsylvania, or Baltimore, Maryland, in order to decrease the draft of the vessel to Morrisville, Pennsylvania, the Universe Tankships contract provided for additional charges to cover the time and expense attributable to the discharge of such cargo. Subject to this limitation, the charges per ton of iron ore, based upon the fresh water draft to which the ships were loaded, were as follows: Draft
Per Ton Rate
0 inch to 25 feet 6 inch
$3.47
25 feet 6 inch - 26 feet 6 inch
3.27
26 feet 6 inch - 27 feet 6 inch
3.10
27 feet 6 inch - 28 feet 6 inch
2.95
28 feet 6 inch - 29 feet 6 inch
2.81
29 feet 6 inch - 30 feet 6 inch
2.69
30 feet 6 inch - 31 feet 6 inch
2.57
31 feet 6 inch - 32 feet 6 inch
2.47
32 feet 6 inch - 33 feet 6 inch
2.38
33 feet 6 inch - 34 feet and over
2.24 At the option of the petitioner, the term of the charter in the Universe Tankships contract *315 could be extended for an additional two years, whereupon the freight rates during such extended term would be reduced by 20 cents per long ton of ore transported and the petitioner would receive an additional credit of 30 cents per long ton, the total amount not to exceed 20 cents per long ton of the ore transported during the first three years of the contract. That contract also provided that at the option of the petitioner, Universe Tankships, Inc. might be required to construct a third vessel carrying ore pursuant to the terms of the contract, whereupon the petitioner would be obligated to provide an additional 669,000 long tons of iron ore per year for a period of three years from the time of the first loading thereof. The contract further provided that in the event that the term of the contract was extended for a period of five years, petitioner was granted an option to purchase the vessels chartered thereunder at a stated price. Both the Joshua Hendy contract and the Universe Tankships contract provided that the shipper would bear the excluded charges enumerated in the bid proposal. Navios Corporation (hereinafter referred to as Navios) was organized by petitioner under the *316 laws of the Republic of Liberia on December 7, 1953, to engage in the chartering of ore carriers for the transportation of the iron ore mined by Orinoco at Cerro Bolivar. Petitioner paid in $50,000 for 500 shares of the common stock of Navios. No additional stock was issued by Navios and no capital contributions were made by petitioner to Navios. Navios established its principal office in Nassau, Bahamas. Navios and Hendy International Corporation entered into a contract of affreightment dated January 7, 1954, in substitution for the prior contract between petitioner and Joshua Hendy Corporation dated February 1, 1953. The Hendy International contract provided that the carrier would nominate and supply eight vessels for a period of two years to transmit 1 million tons of iron ore per year from Puerto Ordaz to the designated ports in the United States serving petitioner's mills. The contract provided a schedule of charges per ton of iron ore, regardless of port of destination, based upon the draft to which the ships were loaded, as follows: Draft
Per Ton Rate
23 feet
$4.34
24 feet
4.03
25 feet
3.75
26 feet
3.60
27 feet
3.45
28 feet
3.30
28 feet 4 inch
3.25 By letter dated January 15, 1954, addressed *317 to Joshua Hendy Corporation, petitioner guaranteed "that all of the obligations to be performed by the Navios Corporation under Contract of Affreightment dated as of January 7, 1954, between Navios Corporation and Hendy International Corporation will be performed by Navios Corporation and by its assignee in the event the aforesaid Contract of Affreightment is assigned by the said Navios Corporation * * *". Navios and Universe Tankships, Inc., entered into a contract of affreightment dated July 15, 1954, in substitution for the contract dated February 1, 1953, between petitioner and Universe Tankships, Inc. The new contract provided for the construction of three vessels, thereby resulting in the exercise of the option with respect to a third vessel in the original contract. With this exception, the terms of the new contract were substantially the same as the original contract. The charges per ton of iron ore, based upon the fresh water draft to which the ships were loaded were as follows: Draft
Per Ton Rate
21 inch and under
$4.88
22 feet
4.43
23 feet
4.05
24 feet
3.74
25 feet
3.47
26 feet
3.27
27 feet
3.10
28 feet
2.95
29 feet
2.81
30 feet
2.69
31 feet
2.57
32 feet
2.47
33 feet
2.38
34 feet and over
2.24 By *318 letter dated July 6, 1954, addressed to Universe Tankships, Inc., petitioner guaranteed "that all of the obligations to be performed by the Navios Corporation under Contract of Affreightment, dated as of July 15, 1954, as the same may be amended from time to time, between Navios Corporation and Universe Tankships, Inc., will be performed by Navios Corporation and all assignees of, through or under it." The following schedule sets forth a projection to the years 1957-1960, inclusive, of the rates that were charged by Universe Tankships, Inc., under its 1954 contract of affreightment with Navios and by Hendy International under its original contracts of affreightment with Navios: [3]
Years
1957
1958
1959
1960
Assumed Vessel Draft
25 feet 0
25 feet 0
29 feet 0
30 feet 0
inch
inch
inch
inch
Universe Tankships, Inc.
Contract July 15, 1954
Contract Rate Per G.T. to
U.S.A. Ports
$3.47
$3.47
$2.81
$2.69
Fuel Escalation
.35
.35
.13
.12
Wage Escalation
.03
.03
.03
.02
Venezuelan Port Expense
.12
.12
.10
.06
Cargo Insurance, Port
.06
.06
.06
.06
Agents
Total Universe Projection
$4.03
$4.03
$3.13
$2.95
Hendy International
Corporation
Contract Jan. 7, 1954
Contract Rate Per G.T. to
U.S.A. Ports
$3.75
$3.75
$3.25
$3.25
Fuel Escalation
.36
.36
.16
.15
Wage Escalation
.03
.03
.03
.02
Venezuelan Port Expense
.12
.12
.10
.06
Cargo Insurance, Port
.06
.06
.06
.06
Agents
Total Hendy Projection
$4.32
$4.32
$3.60
$3.54
Average Projection
$4.18
$4.18
$3.37
$3.25
(Universe and Hendy)
*319 By letter dated February 25, 1956, Mr. William H. Yost, Executive Vice President of Navios, submitted to the petitioner an estimate of the ore lift for vessels under firm contract for the period April 1, 1956, through March 31, 1957, on the basis of 24 feet loaded draft from Puerto Ordaz to the United States, excluding any vessels required to fulfill other commitments. In preparing projected costs, the data submitted provided for an average cost per ton "plus 10% profit on costs." In a letter dated January 7, 1957, Mr. Roger M. Jones of Navios Corporation transmitted to petitioner "data which gives our estimated 1957 costs for each service plus the mark-up required to return a 20% profit on the gross." In establishing transportation rates as of April 1 for each of the years before the Court, similar cost studies were available to the petitioner. By letter dated June 14, 1957, Mr. F. J. McWilliams, Vice President-Comptroller of Navios, transmitted a revised profit and loss forecast for the year 1957 showing a decrease from the forecast of April *320 1. Mr. McWilliams attributed this decrease to lower than expected drafts in the loadings for the period through August and the delay in the reporting dates of two 35,000 ton ore carriers. Mr. McWilliams stated "The addition of seven standard Liberties to the Venezuelan fleet with a carrying capacity of approximately 450,000 tons cost approximately $2 additional per ton to transport the ore compared with the above mentioned modern ore carriers." In a memorandum of a meeting dated March 26, 1959, between the representatives of petitioner and Navios, for the discussion of the Navios ocean transportation rate, Mr. Yost reported that due to the success of the dredging program on the Boca Grande Bar much deeper drafts were being obtained and would continue for the balance of the year 1959. He pointed out the new specialized ore carriers had caused a marked increase in the general efficiency and a lowering of the transportation cost per iron unit of ore. As a result of such savings, it was decided that Navios would reduce its existing rates by approximately 5 percent and would absorb certain charges imposed by Orinoco Mining Company. This enabled the reduction in cost to be passed on to *321 the petitioner through Orinoco without offering a reduction in excess of 5 percent to its other customers. Thereafter, for the period beginning April 1, 1960, as the percentage of ore carried in the large ore carriers increased, adjustments were made in the transportation charges to reflect in part such increases. Offsetting additional charges were assessed against each vessel designated to load ore at Puerto Ordaz to cover pilotage, quarantine and custom charges. In establishing the transportation rates to be charged by Navios for the taxable years 1957 to 1960, inclusive, the parties were cognizant of the fact that there would be a substantial savings in the cost of such transportation as a result of deepening the channel from Puerto Ordaz to open water and the utilization of the larger and more specialized ore carriers. Navios periodically submitted to the petitioner forecasts showing profit and loss predicated upon the utilization of its charter fleet prior to the fixing of transportation rates. Based upon such forecasts, the petitioner by direction determined the charge to be made by Orinoco for the iron ore F.O.B. Puerto Ordaz, the amount to be charged for the loading of the *322 vessel with such ore at Puerto Ordaz, and the rate to be charged by Navios for the transportation of such ore both to United States ports and to customers in Europe. In determining such charges, petitioner took into account the following considerations: (1) The taxes due from Orinoco to the Venezuelan government were measured by the price of the ore F.O.B. Puerto Ordaz. That price was subject to challenge by the Venezuelan authorities. (2) The Venezuelan authorities might likewise look to the transportation charges to ascertain whether the establishment of an inadequate selling price for the ore F.O.B. Puerto Ordaz was offset by an excessive charge for transporting the ore. If so, the Venezuelan government could claim that a portion of the transportation costs should be included in determining the fair market value of the ore. (3) Except for such allocation, the shipping income of Navios would not be subject to taxation either by Venezuela or by the United States. The income of Orinoco was taxable by Venezuela, and was also subject to taxation by the United States to the extent that foreign tax credits could not be used to offset the U. S. tax. The income of petitioner was taxable *323 by the United States. (4) If the Venezuelan iron ore was offered for sale in the United States on a C.I.F. basis, or on a basis whereby transportatin was made available by Navios for a total delivered cost substantially below the comparable price of the Mesabi ore, it would affect the stability of the prices at which Mesabi ore was being offered. Petitioner's contractual relationships with purchasers of Mesabi ore from Oliver Mining Company, a subsidiary, would be adversely affected. Except for references to the "oversupply" of modern ore carriers coming into the market in the spring of 1959, it does not appear that in setting the rates to be charged by Navios for the transportation of iron ore to U.S. ports any consideration was given to whether unrelated ship owners or operators would be willing to undertake the transportation of such ore and the rates that these unrelated operators would charge on a longterm basis. The following table sets forth total United States shipments of iron ore (exclusive of ore containing 5 percent or more manganese) during the years 1957-1960: 1957
104,970,800
gross tons
1958
66,959,000
gross tons
1959
59,855,000
gross tons
1960
83,873,000
gross tons The following *324 table sets forth total United States imports of iron ore (exclusive of ore containing 10 percent or more managanese) during the years 1957-1960: 1958
27,544,000
gross tons
1957
33,651.000
gross tons
1959
35,617,000
gross tons
1960
34,585,000
gross tons
During each of the contractual periods effective during the period 1957-1960, Navios' rates per gross ton charged to and paid by all its United States customers (including petitioner) were identical for the transportation of iron ore from Puerto Ordaz to the same U.S. port of entry. During the period January 1, 1957, through March 31, 1960, Navios' contractual rates for transportation to the final destination in the United States varied depending on the distance of its customers' plants from the port of entry, but subtraction of the applicable inland transportation tariff from the contract rate results in a uniform rate to port of destination. Effective April 1, 1960, Navios established a separate ocean transportation rate for transportation of iron ore from Puerto Ordaz to United States ports of destination, and a separate charge for stevedoring and related services. At that time, Navios' United States customers became responsible for paying *325 inland freight costs, and Orinoco assumed responsibility for paying Orinoco River tolls. Neither petitioner nor any other United States customer of Navios ever received a rebate or discount from this contractual rate. Navios' rates for shipment of iron ore from Puerto Ordaz to or through the ports of Philadelphia and Baltimore were the same for each contractual period during the yers 1957-1960. A separate and higher rate was set for transportation of the ore to the port of Morrisville, Pennsylvania. This rate to Morrisville was set on a Free Hold of Vessel (FHV) basis. Ore which was shipped inland through the port of Morrisville paid the same rates to the inland destination as ore shipped inland through Philadelphia or Baltimore. The higher rates to Morrisville were predicated on the claim that the trip to Morrisville, further up the Delaware River than Philadelphia, ordinarily took a day longer than Philadelphia/Baltimore as a result of many factors, including the requirement that the narrow Delair bridge across the Delaware River be negotiated only at slack tide, and that the Tacony-Palmyra drawbridge over the River be negotiated only during nonrush hours for the convenience *326 of commuter traffic. Also, the draft in the upper Delaware between Philadelphia and Morrisville was restricted to approximately 25 feet, and most vessels carrying ore to Morrisville had to lighten at Philadelphia before they could proceed upriver. Lightening took additional time, which was a cost of the Morrisville service, as none of the ore lightened at Philadelphia and shipped inland paid the Morrisville differential. An additional separate rate was set for shipments to Morrisville on the vessel called the Ore Convey, a self-discharging ship requiring no shore gear for unloading, and thus incurring little separate stevedoring costs. Navios supplied its United States customers with all of the services necessary to deliver Orinoco's ore to its customers' plants on a fixed and reliable schedule. Navios selected the ship to be used to transport the ore, nominated it for loading at Puerto Ordaz, scheduled the arrival and departure of the vessel at Puerto Ordaz, transported the ore down the Orinoco River channels, transported the ore to the port of destination, made all of the arrangement for discharge of the ore (and where necessary, the loading of the ore on railroad cars), and *327 through March 31, 1960, arranged and paid for the transportation of the ore from port to any inland destination.Navios also handled all of the documentation for the entire shipment, including arrangements for bills of lading, and it insured the ore. If the customer could not receive the ore, Navios arranged storage for later delivery. Navios provided the same basic services for all of its United States customers.
Navios' operations were conducted principally from the Bahamas, although during the years 1957-1960 it also had a number of employees in Venezuela and Uruguay, as follows: Bahamas
Uruguay
Venezuela
Total
1957
51
1
1
53
1958
63
9
1
73
1959
66
10
1
77
1960
65
15
1
81
Seventeen of the 51 employees located in the Bahamas in 1957 were experienced shipping personnel.During the years 1957-1960 Navios also contracted with an unaffiliated company in the United States, Norton Lilly & Company, which handled stevedoring, forwarding and other matters in United States ports pursuant to Navios' instructions. During the years 1957-1960 Navios' operations were conducted by a number of departments and divisions, as follows: (1) The operations department, headed by a chartering manager and his assistants, arranged *328 for the chartering of vessels in accordance with cargo requirements, and then was responsible for the maintenance and supply of the vessels. Before a time charter was entered into, the operations department was responsible for making certain that the vessel would be appropriate for the Navios fleet. Since many of the vessels chartered by Navios were constructed to its specifications, Navios operations personnel, including a naval architect on its staff, participated in drawing up the plans for the vessels and worked closely with the shipowners during the construction stage. After a vessel was taken on time charter, a vessel performance section within the operations department closely monitored the performance of each vessel to make certain that it operated at the speed, fuel consumption, and lift specifications warranted in the time charter. Under its time charters, Navios was also responsible for bunkering its vessels, and the operations department handled these arrangements. In order to permit greater lifts of iron ore on voyages from Puerto Ordaz, Navios bunkered her vessels so that they would carry as little fuel as possible when traversing the Orinoco channels. During the period *329 the Macareo channel was in use, vessels were principally fueled by a bunkering vessel anchored off the coast of Venezuela near Guiria; later, after a new channel had been opened, vessels were bunkered at Port of Spain, Trinidad. (2) The traffic department of Navios, headed by a traffic manager, was responsible for scheduling the vessels under charter to Navios. During the period 1957-1960, Navios operated approximately 50 to 60 ships at one time, and the scheduling of vessels to mitigate bunching or delay at Puerto Ordaz and the ports of destination and to meet the often changing requirements of Navios' customers was a complex task. To prevent delay the traffic department developed a scheduling machine (subsequently imitated by other shipping companies) so that it could keep track of the location of all of the vessels under charter to Navios. The traffic department also matched contracts and requirements against the available fleet and wrote orders to the masters of the vessels instructing them how much cargo to load and where to take it. (3) The operations and traffic departments were supervised by the executive department, which coordinated the activities of the entire company. *330 (4) All departments were supported by the financial department, which included a budget and statistics group, and which kept the company's books of account and prepared financial statements, budget forecasts and long-range plans for the company's activities. During the taxable years 1957 to 1960, inclusive, and prior thereto, Navios did not own any ore carrying vessels. The so-called "Navios fleet" consisted of vessels acquired under contracts of affreightment and long-term time charters. Prior to the taxable year 1957, the major contracts of affreightment then outstanding with Hendy International and Universe Tankships, Inc., were converted to long-term time charters. During the taxable years 1957 to 1960, inclusive, between 81 and 95 percent of the ore which Navios transported from Puerto Ordaz to the United States was carried in long-term time chartered vessels. During that period, only the remaining percentages were carried by vessels chartered on a relatively short-term basis. There was no affiliation or relationship between petitioner, Navios and Orinoco, on the one hand, and the shipowners from whom Navios chartered its vessels, on the other hand. While the conversion from *331 voyage charters to time charters entailed some risk, it also resulted in considerable savings in the cost of obtaining the vessels required to transport the ore. At the same time, an increasingly larger percentage of the ore was transported in larger and more modern ore carriers. This was particularly true with respect to the shipment of ore to petitioner's mills. Among the vessels which Navios time chartered for transportation of ore from Puerto Ordaz to the United States during the years 1957-1960 were the largest vessels which had ever been used in any dry bulk cargo movement.Some of the ships were over twice the size of any vessels previously used in the ore trade. Three of the vessels, the "Ore Chief" class, were approximately 60,000 deadweight tons, and were then the largest ore carrying vessels in the world. Navios also chartered six vessels in the "Ore Mercury" class (approximately 45,000 DWT); three vessels in the "Ore Monarch" class (approximately 44,000 DWT); five vessels in the "Rio" class (approximately 33,000 DWT); one self-discharger of 30,000 DWT (the Ore Convey); three vessels in the "Cerro" class (18,000 DWT); and six vessels in the "Rhine Ore" class (approximately *332 19,000 DWT). The balance of the tonnage under charter to Navios was made up of vessels between 10,000 and 18,000 DWT, many of which were chartered on a shortterm basis, and many of which were phased out during the period 1957-1960 as the larger ore carriers went into service. The vessels of more than 18,000 DWT tons which Navios chartered were specialized "ore carriers," and they were, in general, constructed to Navios' specifications. Prior to April 3, 1959, the vessels transporting the ore from Puerto Ordaz proceeded down the Orinoco River to the Macareo, a tributary of the Orinoco. The vessels would then use the Macareo Channel to the sea. The channel of the Orinoco to the sea, called Boca Grande, was impeded by a bar extending&28 miles out to sea.Prior to dredging, the low water depth of the Boca Grande Bar was only 11 feet. In 1956, Orinoco entered into an agreement with the Venezuelan government to undertake the dredging of a channel through the Orinoco Bar in order that the shipments of ore might go directly. This channel was officially opened on April 3, 1959, and was thereafter used by all vessels carrying ore from Puerto Ordaz. This permitted the loading of vessels *333 in 1959 and 1960 up to a depth slightly less than 30 feet, and in later years to a depth exceeding 30 feet. During the years 1957-1960, Navios transported all of the Orinoco ore bought by purchasers located in the United States with the exception of two companies, namely Eastern Gas and Fuel Associates, located in Everett, Massachusetts; and Iron Mines Company of Venezuela, a Venezuelan subsidiary of Bethlehem Steel Corporation. Bethlehem used vessels which it owned or had acquired on charter, and it had an entirely distinct method of transporting ore down the Orinoco River. During the period prior to the opening of the Barima or Boca Grande channel in 1959, Bethlehem for the most part used 5,000-6,000 ton "punta" ships to carry the ore down the Orinoco to a transfer station at Puerto del Hierro on the ocean, and it then transferred the ore to ocean-going vessels. Bethlehem had originally developed this operation in connection with its own ore reserve down the Orinoco River from Puerto Ordaz. After the opening of the Boca Grande, Bethlehem gradually gave up its transfer operation and sent its oceangoing vessels up the Orinoco. Navios also transported Orinoco ore purchased by customers *334 located in Europe, and Orinoco ore purchased by customers in the United Kingdom. In addition to Orinoco ore, Navios transported quantities of iron ore from Vitoria, Brazil, to the United States; quantities of managanese ore from Brazil, Uruguay, South Africa and India to the United States; and iron ore from Chile and Canada to the United States. Navios also constructed and operated a transfer station in Uruguay. There, river barges which had brought manganese ore down river from Brazil were unloaded, and the ore was stockpiled and reloaded onto sea-going vessels. During the years 1957-1960, Navios also carried some coal and other miscellaneous cargoes, but the cubic capacity of its vessels was generally unsuitable for the transportation of coal. The opportunities for back-haul cargoes on the shipments of Venezuelan ore to the United States were very limited, and during the years 1957-1960 Navios' revenues from cargo carried directly from the United States to Venezuela were insignificant. The following schedule sets forth the average ocean transportation rates per gross ton charged by Navios to petitioner for the transportation of iron ore from Puerto Ordaz, Venezuela, to or through *335 the ports of Philadelphia/Baltimore, Morrisville and Mobile during the years 1957-1960, inclusive: [4]
1957
1958
1959
1960
Revenue from U.S.
Steel
$65,274,437
$76,042,677
$80,278,352
$64,564,371
Less: River Tolls
(7,162,779)
(7,063,689)
(7,447,057)
(3,114,796)
Inland Trans.
(14,377,940)
(17,696,072)
(19,256,378)
(6,063,502)
Revenue Net of River
Tolls & Inland
Trans.
43,733,707
51,282,916
53,574,917
55,386,073
Less:
Stevedoring and
Related Services
(as calculated
by petitioner)
(4,199,632)
(4,441,712)
(4,763,186)
(4,663,703)
Ocean Revenue from
U.S. Steel
$39,534,075
$46,841,204
$48,811,731
$50,722,370
Gross Tons
7,223,187
8,116,477
8,716,798
10,592,571
Average Rate/G.T.
$5.47
$5.77
$5.60
$4.79 The following schedule sets forth the average direct ocean transportation expenses per gross ton incurred by Navios during the years 1957 to 1960, inclusive, in the ocean transportation of iron ore from Puerto Ordaz, Venezuela, to ports in the United States for United States customers: 1957
1958
1959
1960
Direct Costs, Puerto
$53,891,902
$55,624,352
$54,498,562
$32,985,284
Ordaz to U.S.
Less: Inland Trans.
U.S. Steel
(14,377,940)
(17,696,072)
(19,256,378)
Not
Independent Cust-
Included
omers
(2,391,745)
(1,717,936)
(2,316,645)
In
Above
Stevedoring
Costs
U.S. Steel
(3,322,012)
(3,562,101)
(3,861,079)
Independent Cust-
omers
(442,788)
(310,954)
(335,464)
Direct Ocean Freight
Expense
$33,357,417
$32,337,289
$28,728,996
$32,985,284
Tonnage Transported
(Gross Tons)
U.S. Steel
7,223,187
8,116,477
8,716,798
10,592,571
Independent Cust-
omers
723,953
541,732
600,115
297,954
7,947,140
8,658,209
9,316,913
10,890,525
Direct Ocean Freight
Expense Per Ton
$4.20
$3.73
$3.08
$3.03
In *336 1959 it was decided to separate the Venezuelan from the non-Venezuelan business of Navios Corporation. Effective midnight, December 31, 1959, Navios changed its name to Navigen Company and transferred a substantial portion of its business to a new subsidiary, which took the name Navios Corporation. The "new" Navios was also incorporated in Liberia and established in the Bahamas, and Navigen (the "old" Navios) purchased all of its capital stock for $50,000. The "new" Navios, a subsidiary of Navigen, carried on all the operations of the old Navios related to the transportation of Venezuelan ore, while Navigen carried on all services related to the transportation of non-Venezuelan cargoes. The following schedule reflects the gross tonnages carried by Navios and Navigen Corporations from all sources, and gross operating income received during the years 1957 through 1960 from petitioner and other customers: [5]
1957
1958
Gross
Gross
Gross
Gross
Tonnage
Operating
Tonnage Operating
Carried
Income
Carried
Income
Shenango Furnace Co.
150,027
$ 1,403,024
247,014
$ 2,483,631,86
Jones & Laughlin Steel Corp.
55,517
497,341
Pittsburgh Steel Co.
157,252
1,422,247
54,445
528,535
Sharon Steel Corporation
268,216
2,587,853
114,688
1,173,485
Youngstown Sheet & Tube Co.
83,697
814,215
74,967
767,532,150
Alan Wood Steel Co.
9,244
72,088
50,618
400,370
M.A. Hanna Co.
44,545
82,408
419,152
607,771
Wierton Steel Co.
R.N. Corp.
C. K. Williams & Co.
Total Domestic Customers
768,498
$ 6,879,176
960,884
$ 5,961,324
Cia. San Juan S.A.
117,332
909,455
Canadian Foreign S.S. Co.
B.I.S.C. (Ore)
1,094,579
8,896,138
1,511,045
12,535,986
Italian Customers
162,349
1,537,571
206,869
1,983,168
German Customers
804,552
6,423,576
1,067,320
8,643,300
Total Foreign Customers
2,178,812
17,766,740
2,785,234
23,162,914
Total Unrelated Customers
2,947,310
24,645,916
3,746,118
29,124,238
United States Steel Corp.
7,223,187
65,274,437
8,116,477
76,042,677
Total Customers
10,170,497
$89,920,353
11,862,595
$105,166,915
*337 1959
1960
Gross
Gross
Gross
Gross
Tonnage
Operating
Tonnage
Operating
Carried
Income
Carried
Income
Shenango Furnace Co.
299,480
$ 2,975,927
66,377
$ 410,86
Jones & Laughlin Steel Corpl
Pittsburgh Steel Co. Sharon Steel Corporation
215,004
2,141,493
163,968
823,11
Youngstown Sheet & Tube Co.
79,630
793,150
Alan Wood Steel Co.
N.A. Hanna Co.
166,355
241,214
* 77,103
* 223,59
Wierton Steel Co.
59,704
589,89
R.W. Corp.
1,968
9,95
C.K. Williams & Co.
6,001
67,665
5,937
51,73
Total Domestic Customers
766,470
$ 6,219,449
375,057
2,106.17
Cia. San Juan S. A.
Canadian Foreign S. S. Co.
168,553
932,448
* 39,999
* 219.99
B.I.S.C. (Ore)
1,362,434
10,796,016
1,577,039
11,037.67
Italian Customers
244,464
2,234,839
297,534
2,255,69
German Customers
1,069,995
8,266,699
1,194,753
8,042,02
total Foreign Customers
2,845,446
22,230,002
3,109,325
21,555,39
Total Unrelated Customers
3,611,916
28,449,451
3,484,382
23,661,56
United States Steel Corp.
8,716,798
80,278,352
10,592,571
64,564,31
Total Customers
12,328,714
$108,727,803
14,076,953
$88,225,94
For the years 1954 through 1960, the financial position of Navios *338 Corporation * was as follows: Navios Corporation
Balance Sheets
Dec. 31
1954
1955
1956
1957
Assets
Cash
$2,115,125
$2,410,922
$ 4,837,298
$ 3,148,830
Time Deposits
1,582,880
6,141,300
3,000,000
24,425,000
Marketable Securities
10,934,248
Accrued Interest Receivable
9,179
17,827
76,211
518,014
Accounts Receivable
87,050
770,691
2,513,909
6,834,448
Investments and Advances
12,937
Property-Equip. at Cost
Less Accumulated Depr.
1,857
4,049
36,723
1,290,578
Miscellaneous Investments
1,371,225
Other Assets
895
35,011
35,332
155,832
Total Assets
$3,796,986
$9,392,737
$21,433,721
$37,743,927
Liabilities and Capital
Accounts Payable
$ 412,369
$ 345,244
$ 1,250,299
$ 1,785,303
Accrued Expenses
1,029,113
810,551
Accrued Taxes
185
369,537
1,396,416
Voyages in Progress
1,477,114
2,796,658
4,908,693
6,010,846
Capital Stock
50,000
50,000
50,000
50,000$
Income Reinvested in
Business
1,857,503
6,200,650
13,826,079
27,690,811
Total Liabilities and
Capital
$3,796,986
$9,392,737
$21,433,721
$37,743,927
Navios Corporation
Balance Sheets
December 31
1958
1959
1960
Navios Corp.
Navigen Co. *
Assets
Cash
$ 1,838,825
$ 2,686,808
$1,261,589
$ 1,413,574
Time Deposits
35,729,129
59,379,366
300,000
75,724,188
Marketable Securities
Accrued Interest Receivable
518,966
868,907
822
296,111
Accounts Receivable
2,577,253
4,202,958
6,859,338
365,007
Investments and Advances
13,403,744
10,130,433
13,504,161
Property-Equip. at Cost
Less Accumulated Depr.
1,987,178
1,992,157
4,115
1,905,249
Miscellaneous Investments
Other Assets
223,033
805,698
182,137
187,943
Total Assets
$56,278,128
$80,066,327
$8,908,001
93,396.233
Liabilities and Capital
Accounts Payable
$ 1,735,472
$ 1,449,888
$ 886,807
$ 3,706,476
Accrued Expenses
2,449,488
7,360,769
3,996,702
1,020,991
Accrued Taxes
1,260,395
1,443,821
1,847,545
496
Voyages in Progress
4,625,544
3,730,230
1,850,722
345,282
Capital Stock
50,000
50,000
50,000
50,000
Income Reinvested in
Business
46,157,229
66,031,619
276,225
88,272,991
Total Liabilities and
Capital
$56,278,128
$80,066,327
$8,908,001
93,396,233
. *339 X For the years 1954 through 1960, the financial results of Navios Corporation's operations were as follows: 1954
1955
1956
1957
Transportation
Services-
Gross Operating Income
$20,514,963
$53,720,595
$76,713,387
$98,135,748
Transportation
Services-
Expenses
Inland Freight
4,395,260
12,328,819
14,858,793
19,734,739
Stevedoring &
Related Services
1,235,982
3,107,221
3,558,563
4,240,867
Port & other Exp.
1,673,991
6,068,610
11,353,494
5,181,313
Ocean Vessel Exp.
11,301,626
27,161,290
35,297,674
44,570,025
Vessel Fuel Oil
513,871
3,533,108
9,446,132
Idle Vessel Exp.
Contract Cancellation
Reloading Stockpiled
Ore,107,210
Total Transportation
Services-Expense
18,606,859
49,179,811
68,601,712
83,173,076
Balance
1,908,104
4,540,784
8,111,675
14,962,672
General & Admin. Exp.
Employment Cost
16,294
94,312
250,926
347,655
Travel & Entertainment
16,392
41,276
74,239
79,596
Space Rentals
1,584
7,010
12,530
14,103
Communication Exp.
2,871
23,678
15,374
67,942
Office Expense
12,507
44,076
59,590
51,323
Other Overhead
6,107
24,127
19,967
52,547
Intercompany Allocation
Total General & Admin.
Expense
55,755
234,479
462,626
613,166
Other Income
Interest
5,154
36,842
268,405
655,373
Dividends Received
Net Adjustment of
Security Valuation
Miscellaneous
77,467
183,233
Total Other Income
5,154
36,842
345,872
838,606
Provision for Taxes
369,493
1,323,380
Net Income
$ 1,857,503
$ 4,343,147
$ 7,625,428
$13,864,732
*340 1958
1959
1960
Navios Corp.
Navigen Co.
Transportation
Services-
Gross Operating Income
$109,642,690
$109,842,844
$78,436,116
$ 8,610,366
Transportation
Services-
Expenses
Inland Freight
21,698,563
23,380,203
Stevedoring &
Related Services
4,218,218
4,455,959
3,605,649
754,150
Port & other Exp.
6,291,459
5,700,957
3,438,499
344,657
Ocean Vessel Exp.
46,218,809
38,202,282
40,094,163
4,566,374
Vessel Fuel Oil
9,863,701
8,038,005
7,392,139
850,968
Idle Vessel Exp.
1,604,479
2,577,767
1,294,819
Contract Cancellation
330,000
2,414,012
12,588
Reloading Stockpiled
Ore
1,107,210
Total Transportation
90,225,229
83,542,352
58,239,281
6,528,737
Services-Expense
Balance
19,417,461
26,300,492
20,196,835
2,081,629
General & Admin. Exp.
Employment Cost
429,521
509,509
536,856
35,000
Travel & Entertainment
83,644
98,142
75,147
28,043
Space Rentals
33,469
37,080
3,078
Communication Exp.
81,439
76,151
78,873
17,539
Office Expense
87,529
79,294
84,260
7,963
Other Overhead
97,803
129,780
51,962
5,194
Intercompany Allocation
(121,000)
121,000
Exense
813,405
929,652
743,176
214,739
Other Income
Interest
1,143,723
1,974,071
40,687
2,924,839
Dividends Received
17,500,000
Net Adjustment of
Security Valuation
(5,999,999)
Miscellaneous
(2,914)
1,327
Total Other Income
1,140,809
(4,025,928)
40,687
20,426,166
Provision for Taxes
1,278,447
1,470,522
1,718,121
51,684
Net Income
$18,466,418
$19,874,390
$17,776,225
$22,241,372
*341 OPINION As the world's largest producer of steel, petitioner required a corresponding supply of iron ore for processing at its "works." Extensive deposits of iron ore were discovered in the state of Bolivar, Venezuela. Petitioner organized a corporation under Delaware law, Orinoco Mining Company, to develop those deposits. As the development proceeded, it became necessary to provide a means of transporting the ore from the mine site to the petitioner's steel mills in the United States. After considering various alternatives, petitioner organized Navios Corporation, a Liberian shipping company, for that purpose. Both the mining company and the shipping company were wholly owned subsidiaries of the petitioner. One of the primary considerations, if not the controlling consideration, for thus separating the mining function from the transportation function was to enable the petitioner to minimize the taxes due to Venezuela by limiting its reach to the income attributable to the mining of the ore. Consistent therewith, petitioner established a price for the ore F.O.B. Puerto Ordaz, Venezuela, at which price such ore would be sold to any and all producers of steel either in the United *342 States or in other countries. With respect to the transportation charges, Navios enabled the petitioner to provide for the transportation of the ore from Venezuela to United States ports, as well as to foreign buyers, without subjecting the income realized therefrom to tax either in Venezuela or in the United States. In addition, Navios could obtain the savings attributable to "foreign flag" operations to the extent that Navios might ultimately decide to own or to operate the ships itself. The decision thus to divorce the shipping operations from the mining operations was a sound business decision not subject to question because the avoidance of United States income taxes was also a consideration. It was contemplated from the outset that Navios would ultimately acquire by charter, or otherwise, a fleet of ore carriers capable of transporting up to 10,000,000 tons of iron ore per year. Once the navigational and other problems were resolved, the bulk of the fleet would be obtained under long-term time charters, many of the vessels to be built to specifications suitable for the lifting of iron ore under navigational conditions existing or anticipated in Venezuela and at the major *343 ports of delivery. During the years before the Court, Navios completed the assembly of such fleet.
The petitioner was both a user and a supplier of iron ore in the United States. Through the Oliver Mining Company, a subsidiary or division, petitioner supplied iron ore to other steel producers. Such ore was supplied at a price established each year as of April 1, by one or more independent producers and adopted by the industry. In making its Venezuelan ore available to the United States market, petitioner was not willing to offer such ore at a price which would undercut the established price for domestic ore. At the direction of the petitioner, Navios would thus establish transportation rates for the movement of the iron ore from Venezuela to United States ports which, when added to the cost of the ore F.O.B. Puerto Ordaz, Venezuela, would result in a delivered cost compatible with the price of domestic ore. Both petitioner, and any other users of Venezuelan ore, were to be charged that same price. However, there was no obligation on the purchaser of Venezuelan ore to utilize the transportation services of Navios. In fact, a subsidiary of Bethlehem Steel Company, and the largest *344 independent purchaser of Venezuelan ore from Orinoco, took such ore F.O.B. Puerto Ordaz and transported it to United States ports on Bethlehem controlled ships. In reliance on section 482, respondent has allocated to petitioner a portion of the charges by Navios for the transportation of iron ore from Puerto Ordaz, Venezuela to the petitioner at designated United States ports. Respondent has determined that 25 percent of the transportation charges by Navios for delivery of iron ore to the petitioner, together with a port differential charged on account of shipments to the Fairless Works, Morrisville, Pennsylvania, should be allocated to the petitioner pursuant to that section. The resulting amounts allocated to the petitioner are, as follows: Year
Allocation
1957
$11,072,585
1958
13,042,107
1959
13,624,330
1960
14,402,384
Total
$52,141,406
Section 482 provides that, in the case of two or more controlled corporations, respondent may allocate income among subsidiary corporations if he determines that such allocation is necessary in order to prevent the evasion of taxes or clearly to reflect the income of any of such corporations. [6] It is clear from the record in this case that petitioner controlled *345 both Orinoco and Navios, as a matter of law through the ownership by petitioner of all of the outstanding stock of both, and as a matter of fact because the actions taken by both Orinoco and Navios were taken at the direction of the petitioner. Section 482 grants to the respondent broad discretionary authority to "distribute, apportion, or allocate gross income, deductions, credits, or allowances" between controlled corporations where the respondent determines that such action is necessary in order to prevent *346 an evasion of taxes or clearly to reflect the income of any of such controlled corporations. Notwithstanding such broad authority, respondent has in his regulations provided various guidelines for the application of section 482. (Regulations § 1.482-1 et seq.) In substance, the regulations recognize that where the price at which the goods are sold, or the charge for which the services are rendered, are comparable to the amount that would have been charged in a transaction between independent parties, there is no occasion to allocate income or deductions under section 482. At the outset, petitioner contends that the allocations made by the respondent were "without support in the record, duplicative, inconsistent with stipulated facts, and arbitrary and capricious." When viewed in the light of the existing record, the Court might be inclined to agree with the petitioner. However, at the time that the notice of deficiency was issued, respondent did not have access to all of the records now before the Court. The fact that respondent may have been "heavy handed" in his allocation does not preclude this Court from finding the proper amount, if any, to be allocated to the petitioner. *347 American Terrazzo Strip Co. v. Commissioner,56 T.C. 961 (1971); Baldwin-Lima-Hamilton Corporation v. United States,435 F.2d 182 (7th Cir. 1970). Secondly, petitioner argues that its income was not, in fact, distorted and U.S. income taxes are not evaded by its purchases of transportation services from Navios. In support of this position, petitioner relies on the fact that unrelated steel producers paid Navios the same rates as petitioner; that petitioner paid an unrelated carrier of iron ore more than it paid Navios for transportation from Chile to the United States on a comparable basis; and, that Navios' rates were comparable to the rates charged in the ore voyage charter market. While allegations made by petitioner in support of its argument may be factually correct, respondent is able to point to other transactions which would tend to prove the opposite. For example, a subsidiary corporation of Bethlehem Steel Corporation, the largest independent purchaser of Venezuelan ore from Orinoco, did not purchase transportation services from Navios. Presumably, Bethlehem found that it could do the job for less. With respect to the charter market for ore carrying vessels, it is *348 clear from the record that during the years involved in this proceeding there were no published charter rates for ore carriers of any significance. [7] *349 Individual rates selected both by petitioner and respondent depended upon particular conditions at that time, and did not constitute a measure of what might be a reasonable charge for a continuing relationship involving the transportation of more than 10 million tons of iron ore per year. The comparability tests in the regulations cannot be relied on because the transportation of iron ore on the basis proposed by the petitioner and Navios had never been done previously. There could be no "independent transactions with unrelated parties under the same or similar circumstances" within the meaning of section 1.482-1 (d)(3) of the regulations. The petitioner cites other factors in support of the reasonableness of the rates charged by Navios, such as the risks faced by Navios, the comparable earnings of Navios with selected transportation companies, and the comparable profits of Navios and Orinoco in relationship to their respective costs of operation.The question is whether, assuming all of these considerations, the transportation charges were "arm's length." After all of these risks are factored in, there remains the question whether petitioner would have been willing to contract for such rates, on the same assumptions, with an independent transportation company. Conversely, whether an independent transportation company would have been willing to supply the transportation services for less. Finally, the petitioner contends that there is no occasion for the reallocation of the transportation charges between Navios and petitioner because the price charged by Orinoco for the ore F.O.B. Puerto Ordaz and the transportation *350 charges by Navios to the port of destination, when taken together, resulted in a delivered price for the Venezuelan ore which was comparable to the price of domestic ore paid and charged by the petitioner on the Great Lakes. Hence, petitioner argues that its income was not distorted, and that no taxes were evaded, regardless of the reasonableness of the shipping charges. If petitioner's position is sound, it would be immaterial what price was charged by Navios to transport the ore from Venezuela to U.S. ports. Accordingly, the Court will direct itself to this argument before considering the reasonableness of the transportation charges. With respect to this issue the question resolves itself into whether an allocation of the shipping charges is necessary in order to prevent the evasion of taxes or clearly to reflect the income of petitioner within the meaning of section 482. Petitioner contends, and the respondent does not seriously question, that the delivered cost of the Venezuelan ore to petitioner's mills in the United States was comparable to the cost of domestic ore. It would follow that petitioner's cost of producing steel was the same regardless of the source of the ore. *351 In fact, it might even be assumed that if Orinoco had sold the ore on a delivered basis, and supplied the shipping either directly or by contract with Navios, respondent would have been bound by his regulations. For the petitioners to adopt such a course of action would, however, be self-defeating. While there would be no additional liability for income taxes due to the United States, the resulting additional income would have been taxable by the government of Venezuela. The petitioner would seem to take the position that if there is to be an allocation of the transportation charges, or the income resulting therefrom, such allocation should be between Orinoco and Navios. In other words, if the shipping charges were excessive, such excess is attributable to the inadequacy of the price for the ore F.O.B. Puerto Ordaz and not to the delivered cost of the ore at the U.S. ports. In effect, the petitioner would have this Court reallocate the income as between Orinoco, Navios and petitioner. That approach would ignore the requirement that the charges paid by petitioner for the transportation of the ore must be judged in the light of what might be expected if such transportation had been *352 negotiated separately between petitioner and an unrelated carrier. Lufkin Foundry and Machine Company v. Commissioner,468 F.2d 805, 808 (5th Cir. 1972). The petitioner also argues that there were constraints, legal or otherwise, which prevented the delivery of the Venezuelan ore in the United States at a price or cost which would undercut the market for domestic ores.Petitioner would consider such restraints as analogous to the legal restraints to which the taxpayer was subject in Commissioner v. First Security Bank of Utah,405 U.S. 394 (1972). The fact is that petitioner was able to develop a source of iron ore in Venezuela which could be delivered to its mills at a cost considerably below the Lake Erie price.The Court finds no legal constraints that would prevent the petitioner from taking advantage of lower iron ore prices.The problem was that petitioner was not willing to offer the Venezuelan ore at a delivered price on the Great Lakes that would undercut the price that petitioner was charging for the ore which its domestic producers sold in that market. Thus, while the Court is not convinced that petitioner would have violated any United States law if the Venezuelan ore had *353 been offered on a delivered basis below the prices for domestic ores, the result might have been even more disruptive of its business. The price of the Venezuelan ore was set at a lower figure F.O.B. Puerto Ordaz, coupled with an equalization factor in the transportation charges, which would be available to outside purchasers without jeopardizing the Lake Erie price.Except for Bethlehem Steel Company, most purchasers would not be in a position to contract independently for transportation of the ore to the site of their mills. As was expected, so long as the delivered price was competitive with the cost of domestic ore, most customers would avail themselves of the transportation services offered by Navios. On the other hand, with planned shipments of up to 10 million tons per year, petitioner admittedly could have contracted with Universe Tankships, Inc.,--and possibly Hendy International--for the transportation of the ore from Puerto Ordaz to its mills for considerably less than the rates charged by Navios.With the cooperation of the parties, the Court has reconstructed hypothetical rates at which an independent carrier, such as Universe Tankships, would have been willing to provide *354 the transportation services provided by Navios. It is clear that the rates charged by Navios substantially exceeded the rates which would have been charged for the same services in an arm's-length negotiation between the parties and a nonrelated carrier, such as Universe Tankships. Petitioner could have bought the services for less. To fail to do so, thereby enabling Navios to reap the benefit of excessive freight rates, is precisely the type of situation dealt with in section 482. Oil Base, Inc. v. Commissioner,362 F.2d 212 (9th Cir. 1966), cert. denied 385 U.S. 928 (1966). Having determined that the allocation of the portion of the income or services of Navios to the petitioner is justified under section 482 in order to prevent the distortion of the income of petitioner and its controlled corporation, which results in the evasion or avoidance of U.S. income taxes, the Court is faced with the more difficult problem of arriving at the proper amount to be allocated in each year. For this purpose, the Court has considered various alternative bases. At the outset, the management of Navios selected a return of 10 percent of costs, and later a return of 20 percent of costs, as a *355 basis for providing a reasonable profit. While the actual return which resulted from the rates charged to unrelated shippers is considerably less than 20 percent, Navios could not charge those shippers any more than it charged petitioner. For this reason, the lesser return is not regarded as having any particular significance. Suffice to say, that both Navios and the petitioner contemplated a return of from 10 to 20 percent on cost as a basis for justifying the freight charges. There is some dispute between the parties with respect to the appropriate costs to be considered in arriving at a rate of return. In our opinion, the cost of inland freight should not be taken into account. Such charges had no relation to the services provided by Navios. When it suited petitioner's convenience, inland freight was charged directly to the customer. On the other hand, idle vessel expense is both appropriate and necessary in determining the cost of ocean transporation. Such expense represented the cost applicable to those ships which were taken out of service due to the fact that larger and more efficient vessels became available, as the navigational depths permitted the use of the new ore *356 carriers. It is the savings which resulted from such carriers that gives rise, in part, to the excessive income which is being allocated from Navios to the petitioner. Finally, any rate of return on cost should not reflect income taxes, either hypothetical or actual, which might apply to the resulting income. The amount of taxes due would depend on varying factors, peculiar to the corporate organization and activities of a particular carrier. Applying these principles to the income and expenses of Navios, as agreed to by the parties, the income in excess of 20 percent of the cost of the transportation services is shown in the following schedule: [8] (000 omitted) 1957
1958
1959
1960
Transportation Services-
Gross Operating Income
$98,136
$109,643
$109,843
$78,436
Less: Inland Freight
19,735
21,699
23,380
-
Gross Income from Navios
Services
$78,401
$ 87,944
$ 86,463
$78,436
Transportation Services
Expense
$83,173
$ 90,225
$ 83,542
$58,239
Less: Inland Freight
19,735
21,699
23,380
-
Cost of Navios Services
$63,438
$ 68,526
$ 60,162
$58,239
Transportation Services-
Operating Income
$14,963
$ 19,418
$ 26,301
$20,197
Less: 20% of Cost of
Navios Services
12,688
13,705
12,032
11,648
Income in Excess of
20% of Cost
$ 2,275
$ 5,713
$ 14,269
$ 8,549
*357 Alternatively, from the data submitted by the parties the Court is able to find an assumed rate at which a carrier, such as Universe Tankships, would have been willing to transport the ore from Venezuela to United States ports under the same conditions. A computation of that rate is shown in the following schedule. [9]
1957
1958
1959
1960
Average Vessel Draft
25'0
25'0
29'0
30'0
Contract Rate per G.T.
$3.47
$3.47
$2.81
$2.69
Fuel Escalation
.35
.35
.13
.12
Wage Escalation
.03
.03
.03
.02
Venezuelan Port Expense
.12
.12
.10
.06
Idle Vessel Expense
.16
.21
.26
Cargo Insurance-Port
Agents
.06
.06
.06
.06
Management Fee
.15
.15
.15
.15
$4.18
$4.34
$3.49
$3.36
Add: 20% for Risk or
Profit
.84
.87
.70
.67
Assumed Rate
$5.02
$5.21
$4.19
$4.03
*358 The parties have computed the average rates applicable to the shipments of iron ore for the account of the petitioner and are in agreement with respect thereto except that respondent contends that the rates proposed by the petitioner should be increased to reflect an overcharge on account of stevedoring expense. Accepting the rates proposed by petitioner, a comparison of the average rates charged by Navios with the assumed rate which might be charged by an unrelated carrier, negotiating at arm's length, is shown in the following schedule: 1957
1958
1959
1960
Navios' Average Rates
$5.47
$5.77
$5.60
$4.79
Assumed Nonrelated Rate
5.02
5.21
4.19
4.03
Differential
$ .45
$ .56
$1.41
$ .76
If this excess or differential is applied to the tonnages carried by Navios for the account of the petitioner during the years involved in this proceeding, the excess charges would be as follows: 1957
1958
1959
1960
Tonnages Carried for
U.S. Steel (000 omitted)
7,223
8,116
8,717
10,593
Excess Charges by Com-
parison with Assumed
Rate (000 omitted)
$3,250
$4,545
$12,291
$8,051 Upon the basis of the foregoing, it is the opinion of the Court that in order to properly reflect the income of Navios and the petitioner and to prevent evasion or *359 avoidance of taxes, within the meaning of section 482, there should be allocated to the petitioner as additional income for the taxable years involved the following amounts: Year
Allocation
1957
$ 2,300,000
1958
4,500,000
1959
12,200,000
1960
8,000,000
Total
$27,000,000
An appropriate order will be entered in order to proceed with the determination of any remaining issues. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
2. Petitioner's brief requested the following finding: 54. As a result of the constraints set forth in [*] [*] 42-53, and others, Petitioner, Orinoco and Navios had very limited discretion in the setting of prices and rates. The delivered price of Mesabi ore was both a ceiling and a floor on the delivered price of Orinoco ore: a ceiling because no customer would have purchased Orinoco ore if it had been more costly than competitive ores (and some of them had a contractual right to substitute Mesabi ore if it could be used by them less expensively [Tr. 555]), and a floor because the Venezuelan government insisted that Orinoco ore be sold at the highest competitive price, and because Petitioner could not reasonably be expected to supply its competitors with ore at less than market prices and to undercut its own sales of Mesabi ore.
1. Later contracted in name of Universe Tankships, Inc.↩
2. Later contracted in name of Hendy International Corporation.↩
3. The schedule excludes general and administrative expense, idle vessel expense, allowance for profit or risk, and any taxes measured by income.↩
4. The respondent's rates differ from the rates set forth only in that charges for stevedoring services calculated by respondent are lower in the following amounts per gross ton: ↩
1957
$.10
1958
.09
1959
.08
1960
.08
5. Differences in gross operating income from the income statement has not been accounted for and may result from a difference in accounting for "open" voyages. ↩
*. Navigen Company↩
*. A new Navios Corporation was formed as of December 31, 1959. Old Navios Corporation's name was changed to Navigen Company.↩
6. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of of such organizations, trades, or businesses.↩
7. Roger M. Jones, petitioner's expert witness, testified: THE WITNESS: Well sir, in the ore carrying market, I don't think 10% of the iron ore that's moved, or the large volume coal of bauxite movements are ever reported in the market. They're done privately between principals, and this is the reason the tanker market is reported in detail, every fixture is reported, but most of the dry market is unreported. THE COURT: So, you really don't know what the market is. THE WITNESS: Well, you really don't. You only see the tip of the iceberg on the dry market. Very little of it goes through brokers.↩
8. Since a lower rate of return was realized by Navios on shipments to unrelated customers, petitioner is favored by the use of the overall transportation income and expense figures.↩
9. The Management Fee is the price per ton for management originally quoted by Universe Tankships without adjustment for increased tonnages per voyage. Based on the charter rates in its contract, the assumed rate in the case of Hendy International would range between $0.15 and $0.30 in excess of the rates shown. However, it is apparent Universe Tankships was to be the primary carrier and on a competitive basis Hendy International would ultimately have to meet that rate.↩